**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SADHISH K. SIVA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:19-cv-01407** |
| | ) | |
| **AMERICAN BOARD OF RADIOLOGY,** | ) | |
| | ) | **CLASS ACTION** |
| | ) | **Trial by Jury Demanded** |
| **Defendant.** | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Sadhish K. Siva, ("Plaintiff"), for his Complaint against Defendant American Board of Radiology ("ABR" or "Defendant") hereby alleges as follows:

## INTRODUCTION

1.     This case is about ABR's illegal and anti-competitive conduct in the market for initial board certification of radiology physicians ("radiologists") and the market for maintenance of certification of radiologists. In very general terms, a radiologist identifies and assesses abnormalities in imaging studies such as X-rays, computer tomography (CT) scans, and magnetic resonance imaging (MRI) scans. ABR is illegally tying its initial certification product to its maintenance of certification product, referred to by ABR as MOC.

2.     This case is also about ABR's illegal creation and maintenance of its monopoly power in the market for maintenance of certification. ABR is the monopoly supplier of initial certifications for radiologists. Beginning in or about 1994, ABR used its monopoly position in the initial certification market to create a monopoly in the market of maintenance of certifications for radiologists, which is the subject of this lawsuit. Since then ABR has used various anti-competitive, exclusionary, and unlawful actions to promote MOC and prevent and

limit the growth of competition from new providers of maintenance of certification for radiologists. ABR's conduct, including but not limited to tying and exclusive dealing, has harmed competition by preventing competition from others providing cheaper, less burdensome, and more innovative forms of maintenance of certification desired by radiologists.

3.       The tying product is ABR's initial board certification, which it sells to radiologists nationwide. ABR currently sells initial certification services to radiologists in four primary areas of radiology, diagnostic radiology, radiation oncology, medical physics, and interventional radiology/diagnostic radiology, and several subspecialties within the field of radiology. Many radiologists hold multiple initial ABR certifications, purchasing one or more primary certifications or subspecialties.

4.       The tied product is MOC, ABR's maintenance of certification. ABR has tied MOC to its initial certification. As described more fully below, to drive sales of MOC and to monopolize the market for maintenance of certification, ABR has forced radiologists to purchase MOC, charged supracompetitive monopoly prices for MOC, and thwarted competition in the market for maintenance of certification.

5.       Currently, approximately 1,500-2,000 radiologists in the United States purchase ABR primary initial certifications annually. ABR has throughout the relevant period controlled the market for initial certification of radiologists in the United States.

6.       In 2016, the last year for which data is publicly available, ABR sold its MOC product to approximately 26,000 radiologists. Through its MOC program, ABR controls the market for maintenance of certification of radiologists. ABR has unlawfully obtained and maintained its monopoly power in the market for maintenance of certification services for the

2

anti-competitive purpose of requiring radiologists to purchase MOC and not deal with competing providers of maintenance of certification services.

7.     Plaintiff brings this Class Action to recover damages and for injunctive and other equitable relief on behalf of all radiologists required by ABR to purchase MOC to maintain their initial ABR certifications.

## JURISDICTION AND VENUE

8.     Plaintiff brings this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABR's violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

9.     Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, and 28 U.S.C. §§ 1331, 1337, and 1367.

10.     ABR sells its initial certifications and its MOC program in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABR's initial certification services and its MOC program are sold by ABR in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABR's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury by, among other things, *de facto* forcing Plaintiff and other radiologists to purchase MOC, charging supracompetitive monopoly prices for MOC, and reducing competition in the maintenance of certification market.

11.     ABR is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because ABR is found in and transacts business herein.

3

12.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because ABR maintains an office and testing center in Rosemont, Illinois and a substantial part of the events giving rise to Plaintiff's claims occurred herein.

## PARTIES

13.     Plaintiff Sadhish K. Siva, MD ("Dr. Siva") is a graduate of Temple University School of Medicine, where he also completed a cardiac rehabilitation internship. He completed his residency in radiology in 2003 at MetroHealth Medical Center in Cleveland, Ohio, and a fellowship in interventional radiology in 2004, also at MetroHealth Medical Center. MetroHealth Center is Cuyahoga County's public health system and home to the county's most experienced Level I Adult Trauma Center, and the only adult and pediatric burn center in the State of Ohio. Dr. Siva has been a practicing radiology physician since 2004, and also held the position of Assistant Professor at Case Western Medical School from 2004 to 2006. Dr. Siva is a resident of Tennessee.

14.     Defendant ABR is incorporated under the laws of the District of Columbia and files with the Internal Revenue Service as a Section 501(c)(6) not-for-profit organization. ABR maintains an office and testing center in Rosemont, Illinois. ABR is a member board of the American Board of Medical Specialties ("ABMS"), an umbrella organization of twenty-four medical boards that today certify physicians in thirty-nine specialties and eighty-six subspecialties.

## BACKGROUND

15.     Licenses to practice medicine in the United States are granted by medical boards of the individual States. To obtain a license a physician must, among other things, have either a Doctor of Medicine degree ("MD") or Doctor of Osteopathic Medicine degree ("DO") and pass

the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME"). Alternatively, a DO may become licensed to practice medicine by passing a three-step examination sponsored by the National Board of Osteopathic Medical Examiners ("NBOME").

16. According to the USMLE website, the examination "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care." Similarly, the NBOME website provides that its examination assesses "competence in the foundational competency domains required for general physicians to deliver safe and effective osteopathic medical care and promote health in unsupervised clinical settings."

17. Most States require a physician to periodically complete continuing medical education courses ("CME") to remain licensed. According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits organizations that offer continuing medical education courses, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

18. According to its 2016 Form 990 filed with the Internal Revenue Service, the objective of ABR's initial certification is to "determine if candidates have acquired [the] requisite standard of knowledge skill and understanding essential to the practice of diagnostic radiology, radiation oncology and medical physics." Most clinical radiologists purchase initial ABR certifications. Those who do not may include researchers, teachers, academics, and others who may not regularly treat patients.

5

19.     To obtain initial ABR certification a physician must, among other things, pass an ABR-administered examination. ABR first began selling initial certifications in 1934.

20.     No State requires an initial ABR certification for a radiologist to obtain a license to practice medicine.

### ABR Requires Radiologists to Purchase MOC To Maintain Their Initial Certifications

21.     Initially, ABR certifications were lifelong and no subsequent examinations or other requirements were imposed by ABR on radiologists.

22.     In or about 1994, however, ABR announced it would not issue lifelong initial certifications for its pediatric and vascular and interventional subspecialties, and would instead require participation in a new maintenance of certification process to maintain those certifications. By 2002, ABR had eliminated all lifetime certificates and was issuing only time-limited ten-year certificates. By 2007, ABR had fully implemented its MOC program requiring, among other things, passing a secure, proctored, high-stakes, cognitive examination every ten years and completing burdensome and meritless "Practice Quality Improvement" ("PQI") projects.

23.     All ABR-certified radiologists are required to purchase MOC to maintain their ABR certifications, *except that* physicians with initial ABR certifications purchased prior to 1995 (or up to 2002 depending on the certificate) are "grandfathered" by ABR: they are exempt from MOC and yet are reported as having a "Valid" certificate on ABR's website. Upon information and belief, "grandfathered" radiologists who have voluntarily taken and failed MOC examinations are also still reported by ABR as having a "Valid" certificate. ABR reports "grandfathered" radiologists as having "Valid" certificates even though they do not participate in

MOC, solely because they purchased an initial ABR certification before it began issuing only time-limited certificates.

24.     Thus, ABR holds "grandfathered" radiologists to a different standard than their peers, despite the fact these older physicians can be many years out of their residency training and may be among those least up to date on current practice.

25.     The President and Chief Executive Officer of the American Board of Internal Medicine ("ABIM"), another member board of ABMS, has been quoted as admitting with respect to a similar "grandfather" exemption for internists, that "Grandfathering is a really vexing challenge. It's difficult to defend … I would not see those doctors as equivalent to doctors who recertify."

26.     Upon information and belief, up to 50% of the radiologists who obtained an initial ABR certification have been "grandfathered."

27.     Since it has stopped issuing lifetime certificates, ABR has collected substantial MOC fees of up to $340 or more annually per doctor. Throughout most of this time, no other organization or entity offered competing maintenance of certification for radiologists. ABR continues to exempt "grandfathered" radiologists from the requirement to purchase MOC and continues to report them as having "Valid" certificates.

28.     ABR has collected to date tens of millions of dollars in MOC fees from radiologists who have purchased ABR's initial certification. In addition, radiologists, to their financial and personal detriment, have been required to take countless hours away from their practice and family in order to prepare for and take required examinations and to complete mandatory PQI projects. MOC also takes time away from patients and detracts from relevant patient services, to the detriment of ongoing patient care.

29.     ABR automatically enrolls all radiologists with initial ABR certifications in MOC, and charges them a MOC enrollment fee. Dr. Siva paid a $400 MOC enrollment fee to ABR on January 3, 2005, and took a ten-year MOC cognitive examination on October 19, 2012, at an ABR test center in the Chicago area.

30.     Radiologists ineligible to be "grandfathered" who choose not to buy MOC and pay MOC annual fees have been reported on the ABR website as "Not Meeting" MOC requirements or having an "Expired" or "Lapsed" certificate, even though they obtained initial ABR certifications.

31.     In a webinar recently posted to YouTube, ABR's David Laszakovits, responsible for oversight of the development and implementation of ABR MOC from August 2005 to December 2016, reports that *after* MOC was imposed ABR "immediately began evaluating the efficacy of the program." He also admitted that it "became pretty apparent pretty quickly" that the ten-year cognitive examination "did not meet the aims of maintenance of certification" and had no "formative aspects to aid in continuous learning and continuous improvement." [1]  Thus, ABR has admitted that it did not evaluate the efficacy of its MOC product before imposing it on radiologists, and that when ABR did make an evaluation it "became pretty apparent pretty quickly" that the ten-year examination failed to address the stated goals of maintenance of certification. Nonetheless, ABR continued to require the ten-year examination as part of MOC for another ten or more years.

32.     This is especially concerning because while ABR now admits it "became pretty apparent pretty quickly" of the shortcomings of the ten-year cognitive examination privately, it took the exact opposite stance publicly. In an article by the ABR Executive Director and others

---

[1] OLA Webinar, The American Board of Radiology, https://youtu.be/zCeWCAoGAzo (published December 4, 2018).

"For the Board of Trustees" of ABR, copyrighted by ABR and published October 1, 2013, in the *International Journal of Radiation Oncology • Biology • Physics*, ABR forcefully declared with respect to both initial certification and MOC, that "no component is more integral" than the "secure proctored examinations." Nonetheless, as detailed below, ABR discarded the MOC ten-year examination just a few years later.

33.     In 2013, only six years after it imposed MOC, ABR changed its MOC product to "Continuous Certification." Again, there is no available evidence suggesting that ABR evaluated whether its new MOC 2.0 product actually met the stated goals of maintenance of certification before it was imposed. MOC 2.0 would supposedly "link the ongoing validity of certificates to meeting the requirements of MOC," an admission that there had been no such link with the old MOC product. The main feature of MOC 2.0 was that radiologists would now be evaluated annually on their compliance with MOC. ABR advised its diplomates in an email blast that "their MOC requirements will not change but will be evaluated on a more frequent basis." Thus, ABR continued to administer the ten-year MOC cognitive examination despite the fact it "did not meet the aims of maintenance of certification" and also continued to require burdensome and meritless PQI projects. MOC 2.0 also imposed increased annual fees on radiologists. For example, ABR increased the MOC annual fee by almost 30% for radiologists holding certificates in diagnostic radiology.

34.     In January 2019, after just another six years, ABR again changed its MOC product, re-inventing it for the third time in twelve years. What has become a constantly moving target of MOC requirements has not only been confusing and enforced by ABR unfairly, it has made it impossible to undertake any meaningful analysis whether, as ABR claims, there is a

causal relationship between any of ABR's iterations of MOC and a beneficial impact on physicians, patients, or the public.

35.     MOC 3.0 eliminated the requirement of a ten-year cognitive examination for some ABR certificate holders in 2019, and for most of the remaining certificate holders in 2020. That examination, however, has been replaced with a new cognitive test, referred to by ABR as Online Longitudinal Assessment ("OLA").  OLA, however, is not available for the subspecialties of hospice and palliative medicine or pain medicine whose certificate holders must continue to take the traditional examination.

36.     Under OLA, ABR circulates 104 questions each year (two per week) to radiologists, of which only 52 must be answered annually. Radiologists after seeing the question may also decline to answer up to ten questions each year. ABR typically allows one minute to answer each question, although some questions allow up to three minutes to answer. Even radiologists who have recently taken and passed the ten-year MOC cognitive examination are required to participate in OLA. Little information has been made available by ABR about how a radiologist will know if he or she is passing OLA, other than that the "passing standard" will "vary slightly" among radiologists, without explaining what "slightly" means; and that it will take "several years" before an initial evaluation is even made, after which OLA performance will be updated quarterly.

37.     Once again, there is no available evidence suggesting that ABR has evaluated whether MOC 3.0 and OLA actually meet the stated goals of maintenance of certification. In fact, OLA simulates poor clinical practices that could have a detrimental impact on patient care. First, no competent radiologist would limit himself or herself to one to three minutes when making a medical decision. Yet OLA promotes just that by encouraging and rewarding speed,

which in actual clinical practice could result in more subtle radiological findings being overlooked. Nor does OLA represent the actual work flow or environment of a real world radiologist, whose job is to identify and carefully assess abnormalities in X-rays, CT scans, MRI scans, and other imaging studies. No radiologist commits to memory every potential diagnosis for every potential abnormality. Often times, a radiologist may recognize an abnormality but is faced with multiple possible diagnoses, which he or she will then research through online medical databases and other means or confer with a colleague. None of this is provided within the framework of OLA.

38.     In the same YouTube webinar referred to above, ABR admits that no studying will be necessary for OLA and that ABR "doesn't anticipate" incorrect answers "will happen often." ABR also confirms on its website that "[t]he goal with all OLA content is that diplomates won't have to study." When a question is answered incorrectly, an explanation of the correct answer is provided so that when a similar question is asked in the future it can be answered correctly. Unsurprisingly, ABR admits it does "not anticipate a high failure rate." In short, to maintain ABR certification under OLA, a radiologist need only spend as little as 52 minutes per year (one minute for each of 52 questions) answering questions designed so as not to require studying, and for which ABR anticipates neither incorrect answers nor a high failure rate.

39.     Because OLA has been designed so that all or most radiologists will pass, it validates nothing more than ABR's ability to force radiologists to purchase MOC and continue assessing MOC fees. MOC 3.0 also still requires burdensome and meritless PQI projects.

40.     Since imposing MOC 3.0, ABR has required radiologists who have recently passed the ten-year cognitive examination to participate in OLA, even though the ten-year period has not expired. For example, one radiologist who took and passed the ten-year examination in

11

2016 learned just months later that his examination result would be disregarded and he would be required to participate in OLA. Thus, while ABR had previously "grandfathered" tens of thousands of older radiologists from participating in MOC entirely, when it comes to OLA it has refused to "grandfather" younger radiologists even though they have recently passed the ten-year cognitive examination and the ten-year period has not expired.

41.     While an analysis of the average cost to a radiologist to comply with ABR's MOC program specifically is not available, one study has projected that complying with ABIM's maintenance of certification costs internists an average of $23,607 in money and time over a ten year period.

42.     MOC has become increasingly mandatory for radiologists across the country. Plaintiff and other radiologists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to be ABR-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. To create an incentive to purchase MOC, ABMS and its member boards also obtained as part of the Affordable Care Act a 0.5% Medicare payment incentive for doctors participating in MOC. Some health plans pay bonuses or higher fees to doctors for completing MOC activities. As a result of these and other circumstances described herein, ABR-certified radiologists are forced to purchase MOC or suffer substantial economic consequences.

43.     For example, hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. The second largest component is physician and clinical services, many of which are now provided by hospitals as well. Many hospitals, upon information and belief with the assistance and encouragement of ABMS and its

member boards and/or persons affiliated with ABMS and its member boards, have adopted bylaws mandating that physicians purchase MOC. This is magnified in hospital markets that are highly concentrated, *i.e.*, those markets with fewer and typically larger hospitals. Approximately 77% of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

44.     As another example, many Blue Cross Blue Shield companies ("BCBS"), upon information and belief with the assistance and encouragement of ABMS and its member boards and/or persons affiliated with ABMS and its member boards, require physicians to participate in MOC to be included in their networks. In addition, patients whose doctors have been denied coverage by BCBS because they have not complied with MOC requirements, are typically required to pay a higher "out of network" coinsurance rate (for example, 10% in network versus 30% out of network) to their financial detriment. Nearly one in three Americans have BCBS coverage, and nationwide 96% of hospitals and 92% of physicians are in-network with BCBS.

45.     As a further example, doctors who lose hospital privileges because they have not complied with MOC requirements face the possibility of also losing coverage under the hospital's malpractice policy and must purchase more expensive insurance elsewhere.

46.     As with ABR's initial certification, no State requires ABR MOC for a radiologist to be licensed.

47.     Almost twenty-five years after ABR's actions to force radiologists to purchase MOC, no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today. EBM optimizes medical decision-making by emphasizing

the use of evidence from well-designed and well-conducted research, which is notably lacking with regard to ABR MOC and its alleged salutary impact.

48.     That there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public is supported by the facts, among others, that: (a) ABR does not require the many thousands of radiologists it has "grandfathered" to comply with MOC, and (b) ABR admitted in its Annual Report 2012-2013 that it still had "significant work ahead to establish [the] evidence base" that MOC is "associated with superior quality of care, efficiency, and better outcomes." With respect to longitudinal assessments such as OLA in particular, Dr. David W. Price, Senior Vice President of an ABMS-related entity, co-authored a 2018 article in *Medical Teacher*, admitting that evaluating the association between longitudinal assessments "and outcomes of care [and] quality of care" will be "most challenging and time consuming to investigate due to the many factors beyond knowledge that influence the process and outcomes of care." Indeed, at least two ABMS member websites currently include the following statement: "Many qualities are necessary to be a competent physician, and many of these qualities cannot be measured. Thus, board certification is not a warranty that a physician is competent."

49.     ABR's website makes clear that except for those "grandfathered" by ABR, initial certifications can only be maintained by purchasing ABR MOC. By requiring radiologists to purchase MOC to remain ABR-certified, ABR created a wholly new and artificial market for maintenance of certification that has generated substantial additional fees for ABR.

50.     By "grandfathering" older radiologists, ABR has also discriminated against younger physicians, including women and persons of color, who are under-represented in the group of radiologists "grandfathered" by ABR.

51.     The American Medical Association ("AMA") has adopted "AMA Policy H-275.924, Principles on Maintenance of Certification (MOC)," which states, among other things, that "MOC should be based on evidence," "should not be a mandated requirement for licensure, credentialing, reimbursement, network participation or employment," "should be relevant to clinical practice," "not present barriers to patient care," and "should include cost effectiveness with full financial transparency, respect for physician's time and their patient care commitments, alignment of MOC requirements with other regulator and payer requirements, and adherence to an evidence basis for both MOC content and processes." ABR's MOC fails in all of these respects.

**ABR MOC Revenue and Compensation of Management and Key Employees**

52.     Between 2004 and 2017, during which time ABR was collecting new MOC fees, its "Program service revenue" account almost tripled, from $6,072,290 to $16,291,444, as reported in its Form 990 for the fiscal years ending March 31, 2005 and 2017, respectively. During that same period of time, ABR's "Net assets or fund balances" account more than tripled, from $12,906,311 to $38,956,788.

53.     According to its Form 990's, for just the fiscal years ending March 31, 2009, through 2013 (the only years from 2004 to 2016 that ABR disclosed revenue and expenses for initial certification and MOC separately on its From 990), ABR's "Maintenance [of] certification fees" account increased approximately 30% from $5,099,722 to $6,539,395. During that same time, MOC revenue exceeded MOC expenses by an average of about $2.2 million. For fiscal years ending March 31, 2012 and 2013, however, initial certification expenses exceeded initial certification revenue. Thus, revenue from ABR's MOC product was subsidizing ABR's initial certification product.

15

54.    These data demonstrate that MOC is an ever-increasing revenue source for ABR. This is not surprising. Recent residency program graduates, who now more than ever are burdened with substantial debt as they launch their medical careers, pay the bulk of initial certification fees. There is only so much in fees that can be extracted from these recent graduates. MOC, on the other hand, is imposed by ABR on older doctors who have been practicing for as long as several decades, and have more financial wherewithal to pay ABR's MOC fees. In short, ABR created a lucrative new revenue source by imposing MOC on older and more established doctors. This is confirmed by the fact that MOC revenue has increased at a much faster rate than initial certification revenue, and, based on the latest publicly available data, is at least half of ABR's total program revenue.

55.    The fact that MOC is a necessary and lucrative revenue source is especially noteworthy considering that ABR's "Total functional expenses" account as reported on its Form 990 increased from $4 million for the fiscal year ending March 31, 2005 to over $15 million for the fiscal year ending March 31, 2017, an increase of 375%.  A large part of this expense is overhead, including overly generous compensation to ABR Executive Directors. For the fiscal year ending March 31, 2005, Dr. Robert R. Hattery, ABR's former Executive Director, was paid total compensation of $443,563. When he retired just three years later in 2008, by which time ABR was realizing increasing millions of dollars in MOC revenue, his total annual compensation had jumped to $788,910. The next ABR Executive Director, Dr. Gary J. Becker, was likewise paid between $612,357 and $821,439 annually between 2009 and 2014. Dr. Valerie P. Jackson, current ABR Executive Director, was paid total compensation of $751,307 for fiscal year ending March 31, 2016. ABR stopped disclosing MOC revenue and MOC expenses on its Form 990

16

when Dr. Jackson became Executive Director, after ABR increased its MOC annual fees by approximately 30%

56.     Compensation for other ABR key employees has also increased since the advent of MOC. For fiscal year ending March 31, 2005, only compensation for the ABR Executive Director ($443,563) was included in the Form 990 in the "List of Officers, Directors, Trustees and Key Employees." By fiscal year ending March 31, 2017, the account for "Compensation of current officers, directors, trustees and key employees" had almost quadrupled to $1,714,448, reaching a high of $2,075,865 for fiscal year ending March 31, 2015.

57.     Also included in overhead are ABR's lavish pension plan accruals and contributions, which between fiscal years ending March 31, 2015 and 2017 averaged 10.3%. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5%.

### ABR MOC is Not Self-Regulation

58.     ABR claims that MOC is a part of a "social contract" and constitutes self-regulation. For example, former ABR Executive Director Dr. Becker in the ABR Annual Report 2012-2013 stressed "the social contract that defines our relationship with the public. Through this contract, the pubic grants [ABR] the privilege to self-regulate." This and numerous similar statements provide an unwarranted veneer of respectability and integrity to MOC when, as alleged herein, the facts are to the contrary. ABR makes it appear that MOC is accepted by radiologists as self-regulation, which is misleading and untrue.

59.     ABR's statement that MOC constitutes self-regulation is misleading and untrue for at least two reasons. First, not meeting MOC requirements is not grounds for revocation or suspension of a radiologist's license to practice medicine or to undertake any other disciplinary

action. Those self-regulatory functions are mandated and implemented by the medical boards of the individual States, the only relevant self-regulatory bodies. As alleged above, however, radiologists who do not comply with MOC requirements face the loss of hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. In substance, ABR seeks nothing less than to usurp the medical boards of the individual States as the self-regulatory bodies of the medical profession.

60.     Second, ABR is not a "self"-regulatory body in any meaningful sense for, among other reasons, its complete lack of accountability. Unlike the medical boards of the individual States, for example, as alleged above, ABR is a revenue-driven entity beholden to its own financial interests and those of its officers, governors, trustees, management, and key employees. ABR itself is not subject to legislative, regulatory, administrative, or other oversight by any other person, entity, or organization. It answers to no one, much less to the radiologist community which it brazenly claims to self-regulate.

### ABR's Illegal Conduct In Violation Of The Anti-Trust Laws

61.     The product markets relevant to this action are the market for initial board certification of radiologists and the market for maintenance of certification of radiologists.

62.     The relevant geographic market is the United States.

63.     By 2002, all radiologists purchasing initial ABR certifications have been required to purchase MOC or have their certification terminated by ABR. Initial ABR certification is required by ABR to purchase MOC.

64.     ABR has throughout the relevant period controlled the market for initial certification of radiologists in the United States. There are high barriers to entry in the market for

initial certification, including technical, economic, and organizational barriers, as demonstrated by the fact that no other organization or entity has ever offered meaningful competing initial certifications for radiologists.

65.     ABR has market power in the tying market of initial certification of radiologists.

66.     Initial certification and maintenance of certification are separate markets and are not interchangeable or a component of one another. That ABR sold initial certification services for more than sixty years before it started selling MOC establishes that the two markets are distinct.

67.     According to its 2016 Form 990 filed with the Internal Revenue Service, the objective of ABR's initial certification is to "determine if candidates have acquired requisite standard of knowledge skill and understanding essential to the practice of diagnostic radiology, radiation oncology and medical physics." ABR's MOC product, on the other hand, is something different. According to ABR's 2016 Form 990, MOC is intended "to provide continuous quality improvement, professional development and quality patient care." As explained by ABR in a white paper dated June 10, 2004, describing its MOC product: "The intent of the [MOC] examinations is to reinforce the process of individual lifelong learning, rather than to serve as recertification examinations."

68.     Thus, MOC serves substantially the same function as CME. Importantly, however, MOC differs from CME because if radiologists do not see value in particular CME courses or classes they are free to purchase other CME offerings; there is no such meaningful option regarding MOC.

69.     Radiologists have a desire to maintain their initial ABR certification by purchasing maintenance of certification from other providers, but have been unsuccessful as a result of ABR's illegal tying and the unlawful and exclusionary use of its monopoly power.

70.     ABR is illegally tying its initial certification to MOC. As a direct and proximate result, Plaintiff and other radiologists have been forced to purchase MOC from ABR since at least 1994 or lose their ABR certifications.

71.     The National Board of Physicians and Surgeons ("NBPAS") was established in or about January 2015 to provide a competing maintenance of certification product to physicians. Its product extends to physicians practicing in all twenty-four ABMS specialties, including radiology. NBPAS does not offer initial certifications to radiologists or any other physicians, but only maintenance of certification.

72.     To obtain maintenance of certification from NBPAS a physician must, among other things, have at one time held a certification from an ABMS member board, hold a valid state license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an initial certification has lapsed). NBPAS fees are vastly lower than those charged by ABR for its MOC product, and NBPAS maintenance of certification requires vastly less physician time.  For example, in 2019, the average yearly cost of NBPAS maintenance of certification is $84.50 ($94.50 for a DO), while the ABR MOC annual fee is $340 ($205 for medical physics).

73.     The fact that NBPAS offers maintenance of certification but not initial certification further establishes that the two markets are separate.

74.     NBPAS has had very limited success. In 2016, there were over 10,000 hospitals in the United States, including both those registered with the American Hospital Association

("AHA") and community hospitals. According to the NBPAS website, as of February 14, 2019, only 107 hospitals, approximately one percent of hospitals nationwide, accept NBPAS maintenance of certification and not a single insurance company is known to accept NBPAS maintenance of certification. For example, Blue Cross Blue Shield of Michigan is on record refusing certification through NBPAS. In addition, ABR does not recognize NBPAS maintenance of certification.

75.    Upon information and belief, organizations in addition to NBPAS have considered entering, or sought to enter, the market for maintenance of certification services but have been unsuccessful because of the monopoly power and unlawful and exclusionary conduct of ABR.

76.    ABR also unlawfully created and maintained monopoly power in the market for maintenance of certification by requiring radiologists to purchase MOC or lose their ABR certification.

77.    ABR has induced hospitals and related entities, insurance companies, medical corporations, and other employers to require radiologists to be ABR-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

78.    An indication of ABR's illegal tying and monopoly maintenance is that it is able to charge supracompetitive monopoly prices for MOC, as evidenced by the almost three-fold increase in ABR's "Net assets or fund balances" account reported on its Form 990 between fiscal years ending March 31, 2005 and 2017, after it imposed MOC.

79. As a direct and proximate result of ABR's illegal tying and monopoly maintenance, Plaintiff and other radiologists have together been forced to pay tens of millions of dollars in MOC fees and incur other out-of-pocket costs.

80. Initial certification and maintenance of certification are separate products and services. Numerous board certified radiologists do not want to be required to buy ABR's MOC and/or would seek to obtain maintenance of certification from a source other than ABR were it worthwhile to do so.

81. Because of the repeated changes to MOC, radiologists purchasing initial ABR certification and MOC cannot assess the lifetime cost of ABR certification over the several decades of their practice, making it impossible to calculate the life cycle cost.

82. In addition, ABR has been illegally maintaining its monopoly position in the market for maintenance of certification for the anti-competitive purpose of thwarting competition. As a direct and proximate result, NBPAS, an innovative competitor, has been shut out of a substantial portion of the market for maintenance of certification, eliminating meaningful competition in that market to the detriment of Plaintiff and other radiologists who are forced to buy MOC at supracompetitive monopoly prices or lose their certification.

83. ABR's illegal tying and monopoly maintenance has resulted in overly burdensome conditions imposed by ABR on radiologists forced to purchase MOC. These overly burdensome conditions raise the cost of the practice of medicine for Plaintiff and other radiologists; constrain the supply of radiologists, thereby harming competition; and decrease the supply of certified radiologists, thereby increasing the cost of medical services to patients and consumers and presenting barriers to patient care.

84.     ABR's illegal tying, exclusive dealing, and monopoly maintenance results in ABR *de facto* forcing Plaintiff and other radiologists to purchase MOC in order to hold hospital consulting and admitting privileges, receive reimbursement by insurance companies, secure employment by medical corporations and other employers, obtain malpractice coverage, and satisfy other requirements of the practice of medicine. ABR's illegal tying and monopoly maintenance further creates and increases barriers to entry to the market for radiologists' services.

85.     ABR is governed and managed by a board of governors and others that include active participants in the market for radiologists' services and related markets. ABR's restraint on competition in the market for radiologists' services, demonstrated conflicts of interests, and private anticompetitive motives force radiologists, other than those "grandfathered" by ABR, to purchase MOC or lose their ABR certification.

86.     Any alleged justification ABR might offer for its illegal conduct is either beyond the scope of legitimate pro-competitive justifications or is far outweighed by the anti-competitive effects described herein.

87.     ABR has economically coerced purchasers of its initial certification to purchase overpriced, unnecessary MOC from ABR or lose ABR certification as radiologists. ABR's illegal tying, exclusive dealing, and monopoly maintenance has caused anti-competitive effects in the market for maintenance of certification of radiologists.

### **Anti-Trust Injury Suffered By Plaintiff**

88.     Dr. Siva began practicing as a radiology physician in 2004 as a diagnostic and interventional radiologist at MetroHealth Medical Center. He relocated to Tennessee in 2006 and has practiced since then at the Murfreesboro Medical Clinic. Dr. Siva's areas of expertise include

digital and 3D mammography, ultrasound, Doppler ultrasound, breast MRI, GI studies, MRI breast biopsies, CT scans, and nuclear medicine. He is a member of the American Roentgen Ray Society.

89.     When Dr. Siva began his radiology residency program, ABR issued lifetime initial certifications. In the second year of his radiology residency, however, ABR announced it would no longer issue lifetime certifications and that instead only time-limited, ten-year certificates would be issued. Dr. Siva obtained an initial board certification in diagnostic radiology from ABR in 2003. His initial certification was not "grandfathered" because it was obtained after 2001. He was automatically enrolled by ABR in its MOC program upon obtaining his initial certification, charged a $400 MOC enrollment fee, started paying the required MOC annual fees, and began meeting other ABR MOC requirements.

90.     Dr. Siva took his first (and ultimately last) ten-year MOC cognitive examination in 2012 at an ABR testing facility in the Chicago area. He estimates spending at least 100 hours studying for the examination, incurred travel and hotel costs, lost income as a result of taking time off from work, and paid another radiologist $3,000 to cover for him while he was in Chicago, all as a result of being required to take the MOC cognitive examination. Dr. Siva passed the examination with the well-informed belief that he had now satisfied the ABR MOC cognitive requirement for the next ten years and would not be subject to additional cognitive testing until the ten-year period had expired. There was nothing in his letter from ABR announcing his results or in the earlier email blast described above, that indicated any further cognitive testing would be required to maintain his certification before the ten-year schedule then in place.

91.     In 2018, however, he learned ABR was changing MOC and that he would now be

24

required to participate in OLA beginning in 2019, even though his cognitive examination results were to have been valid until 2022. ABR refused his request to honor the full ten-year length of his cognitive examination and Dr. Siva began OLA in January 2019. In effect, Dr. Siva was allowed to use only 60% of the ten-year cognitive examination results.

92.     Dr. Siva, in order to protect his professional position and economic livelihood, has been forced to purchase ABR MOC. He has continued paying his MOC annual fees and completing required MOC activities, including OLA and the burdensome and meritless PQI projects, up through the filing of this Class Action Complaint.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class: all radiologists required by ABR to purchase MOC from ABR to maintain their initial ABR certifications. Specifically excluded from this Class are officers, governors, trustees, or employees of ABR, or of any entity in which ABR has a controlling interest, or any affiliate, legal representative, or assign of ABR. Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

94.     The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 25,000 radiologists.

95.      Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not limited to: (1) whether ABR is engaging in illegal tying, and (2) whether ABR has illegally

created and is maintaining its monopoly power in the market for maintenance of certification; (3) whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class; (4) whether ABR was unjustly enriched as a result of the conduct alleged in this Complaint; (5) the appropriate injunctive and related equitable relief; and (6) the appropriate class-wide measure of damages.

96.     Plaintiff's claims are typical of the claims of other Class members. Plaintiff and all members of the Class are similarly affected by Defendant's wrongful conduct in that they were all forced to purchase ABR's MOC in order to maintain certification. Plaintiff's interests are coincident with and not antagonistic, or in conflict with, other Class members' interests. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff will fairly and adequately protect the interests of other Class members.

97.     Plaintiff has retained competent counsel experienced in class action and complex litigation to prosecute this action vigorously.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions

by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

99.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

## COUNT ONE

### Illegal Tying in Violation of Section 1 of the Sherman Act

100.    Plaintiff incorporates by reference all of the above allegations.

101.    ABR's tying of its initial board certification service and its MOC program is a *per se* violation of Section 1 of the Sherman Act.

102.    Alternatively, even if ABR's tying arrangement is not *per se* illegal, it nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an unreasonable restraint on trade.

103.    There is no legitimate business or other pro-competitive justification for ABR's illegal tying of its initial certification service to its MOC program.

104.    As described above, ABR's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT TWO

### Illegal Monopolization and Monopoly Maintenance in Violation of Section 2 of the Sherman Act

105.    Plaintiff incorporates by reference all of the above allegations.

106.    ABR's creation of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

107.    ABR's maintenance of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

108.    As described above, ABR's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT THREE

### Unjust Enrichment

109.    Plaintiff incorporates by reference all of the above allegations.

110.    Plaintiff and members of the Class conferred a benefit on ABR in the form of the money and property ABR wrongfully obtained as a result of Plaintiff and other radiologists being *de facto* forced to pay MOC-related fees, as described in detail above.

111.    ABR has retained these benefits that it acquired from charging Plaintiff and members of the Class inappropriate, unreasonable, and unlawful MOC-related fees. ABR is aware of and appreciates these benefits.

112.    ABR's conduct has caused it to be unjustly enriched at the expense of Plaintiff and the other Class members. As such, it would be unjust to permit retention of these monies by ABR under the circumstances of this case without the payment of restitution to Plaintiff and Class members.

113.    ABR should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against ABR as follows:

114.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

115.    The unlawful conduct alleged herein be adjudged and decreed:

      a.    A *per se* violation of Section 1 of the Sherman Act;

      b.     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

      c.     Illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act; and

      d.     To constitute unjust enrichment;

116. Plaintiff and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws, and Defendant be required to disgorge the amounts by which it has been unjustly enriched;

117. Defendant, its affiliates, successors, transferees, assignees and other officers, governors, trustees, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

118. Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

119. Plaintiff and the members of the Class be awarded their costs of suit, including reasonable attorneys' fees, as provided by law; and

120. Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Date: February 26 , 2019                    Respectfully submitted,


                                           /s/  C. Philip Curley


                                           C. Philip Curley
                                           Cynthia H. Hyndman
                                           Laura R. Feldman
                                           Benjamin E. Schwab
                                           ROBINSON CURLEY P.C.
                                           300 South Wacker Drive, Suite 1700
                                           Chicago, IL 60606
                                           Tel: 312.663.3100
                                           Fax: 312.663.0303
                                           pcurley@robinsoncurley.com
                                           chyndman@robinsoncurley.com
                                           lfeldman@robinsoncurley.com
                                           bschwab@robinsoncurley.com

                                           Katrina Carroll
                                           LITE DEPALMA GREEBERG, LLC
                                           111 West Washington, Suite 1240
                                           Chicago, IL 60602
                                           Tel: 312.750.1265
                                           Fax: 312.212.5919
                                           kcarroll@litedepalma.com

                                           Michael J. Freed
                                           Brian M. Hogan
                                           FREED KANNER LONDON & MILLEN LLC
                                           2201 Waukegan Road, Suite 130
                                           Bannockburn, IL 60015
                                           Telephone: (224) 632-4500
                                           Facsimile:  (224) 632-4521
                                           mfreed@fklmlaw.com
                                           bhogan@fklmlaw.com

                                           Jonathan M. Jagher
                                           FREED KANNER LONDON & MILLEN LLC
                                           923 Fayette Street
                                           Conshohocken, PA 19428
                                           Telephone: (610) 234-6487
                                           Facsimile:  (224) 632-4521
                                           jjagher@fklmlaw.com

                                           *Counsel for Plaintiff, Sadhish K. Siva*