# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SADHISH K. SIVA,         )
                            )
      Plaintiff,        )     Case No. 19 C 1407
                            )
v.                    )
                            )     Judge Jorge L. Alonso
AMERICAN BOARD OF     )
RADIOLOGY,          )
                            )
      Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sadhish K. Siva, brings this antitrust action against defendant, the American Board of Radiology ("ABR"), contending that the maintenance of certification ("MOC") requirements for ABR-certified physicians violate sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. Defendant has moved to dismiss. For the following reasons, defendant's motion to dismiss is granted.

## BACKGROUND

ABR is one of twenty-four member boards making up the American Board of Medical Specialties, which certify physicians in thirty-nine specialties and eighty-six subspecialties. Plaintiff is a physician who is both licensed to practice medicine and certified by ABR in diagnostic radiology.

Physicians are licensed by medical boards of the individual states, generally after they receive a medical degree and pass a three-step licensing examination. Most states require physicians to complete continuing medical education ("CME") courses periodically in order to maintain their license. Licensure is legally mandatory for any practicing physician.

In addition to licensure, most clinical radiologists also seek certification from ABR, which requires physicians like plaintiff to take an examination to "determine if [they] have acquired the requisite standard of knowledge[,] skill[,] and understanding essential to the practice of diagnostic radiology." (Compl. ¶¶ 18-19; *see id.* ¶¶ 88-89.) Unlike licensure, board certification is technically voluntary, but, as a practical matter, according to plaintiff, it is "increasingly mandatory for radiologists across the country" because radiologists' essential partners in the health care industry require it of them. (*Id.* ¶ 42.) For example, hospitals often require radiologists to be ABR-certified to obtain consulting and admitting privileges; insurance companies require them to be certified to obtain (higher) reimbursements and malpractice coverage; and medical corporations and other employers require them to be certified before they will consider them for employment.

For most of ABR's history, its certifications were lifelong. By 2002, however, before plaintiff had completed his training in radiology, ABR had eliminated lifetime certificates and begun issuing only time-limited ten-year certificates. ABR imposed a new "maintenance of certification" ("MOC") program, which required ABR-certified radiologists to renew their certification every ten years by passing a "cognitive examination" and periodically completing "Practice Quality Improvement" projects. (*Id.* ¶ 22.) Under a grandfather rule, radiologists who initially became certified prior to the imposition of the MOC program are not required to participate in MOC. For all other radiologists, MOC is mandatory to maintain a valid certificate.

According to plaintiff, ABR has itself admitted that the MOC program, at least initially, did not meet its "aims" of "aid[ing] in continuous learning and continuous improvement." (*Id.* ¶ 31.) ABR has twice revamped its MOC program, but, in all three incarnations, plaintiff alleges, "there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public." (*Id.* ¶ 48.) Nevertheless, ABR-certified radiologists, including

plaintiff, have been required to pay allegedly exorbitant amounts for MOC and to meet burdensome testing and education requirements, or risk their status as board-certified physicians.

In Count I, plaintiff claims that ABR has tied its initial certification product to its newer maintenance of certification product in violation of section 1 of the Sherman Antitrust Act, forcing radiologists to purchase MOC to their detriment and the detriment of ABR's would-be competitors. These competitors include the National Board of Physicians and Surgeons ("NBPAS"), which seeks to provide MOC services but has been unable to gain purchase in the market, allegedly due to ABR's tying. In Count II, plaintiff claims that ABR has violated section 2 of the Sherman Act by illegally monopolizing the market for MOC. Finally, in Count III, plaintiff asserts a state-law claim of unjust enrichment, alleging that ABR has wrongfully retained the benefit of funds paid for MOC services that served no useful purpose to the physicians who purchased them, given that there is no demonstrable link between MOC services and improvement in the quality of care certified radiologists provide.

## ANALYSIS

"A motion under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. Stated differently, "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Plaintiff seeks relief via the Clayton Act, 15 U.S.C. §§ 15, 26, which provides a private right of action for treble damages to any person "injured in his business or property by reason of anything forbidden in the antitrust laws[.]" 15 U.S.C. § 15. Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . " 15 U.S.C. § 1. This language has long been interpreted to "outlaw only *unreasonable* restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2.

# I. SHERMAN ACT SECTION 1—TYING

Plaintiff alleges that defendant, which dominates the market for initial certification, violates the Sherman Act by tying its MOC services to its initial certification product, forcing radiologists to purchase MOC in order to receive any continuing benefit from initial certification.

> A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. R. Co. v. United States,* 356 U.S. 1, 5-6 (1958). Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 503 (1969).

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992) (internal citations altered). The alleged tying arrangement in this case is unlawful *per se* (*i.e.*, without proof that anticompetitive effects outweigh procompetitive ones) if "(1) a tie exists between two separate products; (2) the tying seller [ABR] has sufficient economic power in the tying product market to restrain free competition in the tied product market [the MOC market]; (3) the tie affects a not-insubstantial amount of interstate commerce in the tied product [MOC services]; and (4) the tying seller [ABR] has some economic interest in the sales of the tied product [MOC services]." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316-17 (7th Cir. 2006).[1]

In support of its motion to dismiss, defendant argues that the first element of this test is not met because initial certification and MOC are not separate products. According to defendant, it sells only one product: certification, of which MOC is a part.

---

[1] The Seventh Circuit has suggested that, even when allegations of market power are insufficient to state a claim under the *per se* rule, an antitrust plaintiff can state a tying claim under the "rule of reason" by demonstrating that the tie-in's anticompetitive effects outweigh any procompetitive benefits. *See Reifert*, 450 F.3d at 317 n.2 (citing *Jefferson Parish*, 466 U.S. at 35 (O'Connor, J., concurring)). The Court shall not have to consider this possibility separately because, under either the *per se* rule or the rule of reason, plaintiff must plausibly allege that there are two separate tied products, and as the Court will explain, he has not done so.

In an antitrust case, "whether one or two products are involved . . . turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Two items will be considered separate products only when there is "sufficient consumer demand so that it is efficient for a firm" to provide them separately. *Kodak*, 504 U.S. at 462. "Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the history of the products being, or not being, sold separately." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) (citing *Kodak*, 504 U.S. at 462).

According to plaintiff, initial certification and MOC are separate products because there is separate demand for them, as evidenced by the fact that, historically, they have been sold separately. For most of its history, ABR sold initial certification without requiring certified physicians to purchase MOC as well, and it is only in recent years that it has bundled the two together—while still charging separately for each item. *See Jefferson Parish*, 466 U.S. at 22 (anesthesia services billed separately from hospital services, supporting conclusion that they are separate products). Further, NBPAS sells MOC without selling initial certification. Additionally, plaintiff argues that defendant's grandfather rule shows that there is no genuine reason for requiring MOC apart from leveraging defendant's power in the tying market (initial certification) to generate additional revenue, forcing physicians to buy MOC from defendant when they would prefer not to or to use another provider such as NBPAS. If MOC were genuinely essential to the purposes of board certification and therefore of a piece with initial certification, plaintiff suggests, ABR would require it for everyone, not only younger doctors.

The Court is not convinced. First, plaintiff is not quite correct to the extent that he suggests that initial certification and MOC have been sold separately in the past. In fact, there never was a time when they were sold separately. To be precise, certification previously consisted only of what the parties now refer to as "initial" certification, and, later, ABR added the MOC requirement. Stated differently, ABR sold certification without any MOC component, and now ABR sells certification with an MOC component. But ultimately ABR sells only one product: certification of radiologists as having "acquired the requisite standard of knowledge, skill, and understanding essential" to the practice of medicine in their particular specialty or subspecialty. This was once a one-stage process, and it is now a multi-stage process, but it does not follow that the certification process consists of separate products; now as ever, there is only one product.

In a recent case, internists asserted a Sherman Act claim against the American Board of Internal Medicine ("ABIM"), claiming that it tied its MOC product to its initial certification product. The court dismissed the complaint, explaining that the claim failed the *Jefferson Parish* test for separate products:

> Under the *Jefferson Parish* test, the 'character of the demand' for the initial certification and the MOC is the same: certification from ABIM. Internists are not buying "initial certification" or "maintenance of certification," but rather ABIM certification. This is made clear by hospitals and other medical service providers requiring ABIM certification, in general. This fundamental misconception about the nature of the entire certification product offered by ABIM undercuts Plaintiffs' arguments.

*Kenney v. Am. Bd. of Internal Med.*, No. CV 18-5260, 2019 WL 4697575, at *11 (E.D. Pa. Sept. 26, 2019). This case is all but identical, and the Court agrees with the reasoning in *Kenney*.

As in *Kenney*, the fact that the MOC component was only added relatively recently does not make it a separate product. "Almost every product can be viewed as a package of component products: a pair of shoes, for example, as a package consisting of a left shoe and a right shoe; a

man's three-piece suit as a package consisting of a jacket, vest, and pants; a belt as a package consisting of a buckle and a strap. As shown by the last of these examples, it is possible to describe a product as a package of components even if the components are physically integrated at the point of sale to the consumer." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 703 (7th Cir. 1984). But under *Jefferson Parish*, a product's aggregation of separate components into a whole is only a tie-in "if there are separate markets for each product." *Id.* at 703. Thus, a prefabricated building is likely "a single product and not a tie-in of the walls, floors, roof, windows, and so forth; for most of these components are not sold in separate markets, though some are." *Id.* at 704. Similarly, a hospital's pathology services "are just one of the many services provided by the hospital for its patients" and therefore "no separate demand exists for pathological services that is sufficient to create a separate market" from the market for hospital services. *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 477 (7th Cir. 1988) (distinguishing pathologists from anesthesiologists, whose services the Court found to be a separate product in *Jefferson Parish*, because "pathology is a laboratory-based specialty, so that the pathologist, unlike the anesthesiologist, has no face-to-face contact with the patient and the treating physician," and patients and physicians never request specific pathologists). The same logic may hold if the components are not "physical" products or services but intangible goods. For example, in *Jack Walters*, the defendant's prefabricated buildings were not tied to its trademark because "a product and its name are inseparable." *737* F.2d at 704.

Similarly, a "method of doing business ([a] franchise) is not sold separately from the ingredients that go into the method of business," *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670 n.1 (7th Cir. 1985) (citing, *inter alia*, *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir. 1980)), particularly where the "ingredients" may include a franchisor's training of

franchisees in certain essential skills and inspecting their performance periodically to ensure their adherence to the method, *Principe*, 631 F.2d at 309. This "franchisor supervision and control benefits the franchisee in turn" because "[h]is business is identified with a network . . . whose very uniformity and predictability attracts customers." *Id.* Thus, where the McDonald's restaurant chain sold its franchisee a proven and comprehensive business method, its franchise agreement and its lease of restaurant premises to the franchisee were not separate products for purposes of the Sherman Act. *Id.* ("To characterize the franchise as an unnecessary aggregation of separate products tied to the McDonald's name is to miss the point entirely. Among would[-]be franchisees, the McDonald's name has come to stand for the formula, including all that it entails."); *see id.* at 308-311 (explaining relationship between McDonald's and its franchisees); *see also Rick-Mik Enters. v. Equilon Enters. LLC*, 532 F.3d 963, 974-75 (9th Cir. 2008) (citing *Principe* and holding that credit-card processing services were not tied to Shell/Texaco franchise because they were "an integral part of the franchise's operation," and "the franchisee [knew] the contractual limitations and duties before entering into the contract"); *Casey v. Diet Ctr., Inc.*, 590 F. Supp. 1561, 1564, 1566, 1566 n.6 (N.D. Cal. 1984) (franchisor of weight-loss centers did not tie its diet pills to the franchise because "[w]ere it not for the . . . franchised weight control program, there would be no market for the [diet pills, which] may be purchased only by . . . franchisees who use it solely as an integral part of the [franchised] method") (citing *Principe*).

Like the court in *Kenney*, this Court finds that, "while not a perfect comparator, the franchise model is very instructive in [the] analysis" of board certification in medical specialties. 2019 WL 4697575, at *11 n.2 As in the above cases, plaintiff attempts to isolate components of what is essentially a business method—in this case, for assessing whether a physician has "acquired the requisite standard of knowledge, skill, and understanding essential" in her particular

specialty or subspecialty—and declare them to be a tie-in. But what ABR sells to its certified physicians—and, indirectly, to the other industry participants who rely on ABR's credentialing of physicians—is essentially an endorsement based on a "formula, including all that it entails" *Principe*, 631 F.2d at 311, for assessing physicians' knowledge, skill, and understanding. "The desirability" of the endorsement is "utterly dependent upon the perceived quality of the product it represents," *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1354 (9th Cir. 1982), and if ABR ceased to "control the quality of the product" by allowing competitors to provide certification services, then "hospitals, insurance companies, and patients would lose faith in the . . . certification process," *Kenney*, 2019 WL 4697575, at *11 n.2 (citing *Krehl*). "[T]he competitive purposes of the rule against tying are not served by fractionating" ABR's method into "separate components" in that way, as there is no "market distinct from that of [certification] itself" for those undbundled components. *Casey*, 590 F. Supp. at 1566.

What plaintiff describes is demand for the single product of certification, and adding a new component to the product that will cause customers to incur ongoing costs does not make the component a new product. This case and *Kenney* are similar to *Kentmaster Manufacturing Co. v. Jarvis Products Corp.*, 146 F.3d 691, 694-95 (9th Cir. 1998), in which a manufacturer with a dominant market position in slaughterhouse equipment was accused of tying its spare blades, which users of the equipment must purchase continuously as they wear out and which are not interchangeable from one manufacturer to another, to the equipment itself. The court explained that the spare blades were essentially a component of the slaughterhouse equipment:

> [Plaintiff's] description of its product is of a unit made up of equipment and of spares—a unit sold over a period where the purchaser of what might be called section A knows that eventually he will be buying complementary section B. No rational purchaser would look only at A's price and suppose that he could have A without B. Since A will not work for long without B, and since no one else but [plaintiff] makes B, the rational buyer of A must calculate the cost of B when he

> makes his initial purchase. [Plaintiff] alleges no special market imperfections, such as imperfect information, that would prevent consumers from accurately determining the total cost of A and B. According to [plaintiff's] allegations, only an idiot would think of the cost of A without taking into account the cost of B.

*Id.* at 694. The defendant's competing equipment and spare blades worked the same way. *Id.* Under these circumstances, the court held that the slaughterhouse equipment and the spare blades are "a single product, sold over time." *Id.* at 694-95. Similarly here, radiologists such as plaintiff know from the beginning that they must purchase not only initial certification ("section A") but also, eventually, MOC ("complementary section B"), "[s]ince A will not work for long without B." *Id.* at 694. They are two components of a product "sold over time," but they are one product.

According to plaintiff, ABR's imposition of the burdensome and costly MOC requirement was a cynical attempt to boost its revenue that added no value to ABR's product and did nothing to ensure that ABR-certified physicians meet the requisite standard. But that does not make it an independent product for which there is separate and independent demand; indeed, it tends to undercut any such conclusion. Under *Jefferson Parish*, "no tying arrangement can exist unless there is a sufficient demand for the purchase of the [tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately." 466 U.S. at 21-22. "[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Id.* at 16. To the extent plaintiff claims that there is no demand for MOC services apart from demand that ABR has artificially created by imposing the MOC requirement, there is no tie-in, as the court recognized in a similar situation in *Casey*, where the demand was not separate from that for the tying product because "it [was] generated wholly" by the customer's purchase of the tying product:

> Were it not for the Diet Center's franchised weight control program [the tying product], there would be no market for the Diet Supp [the tied product]. Indeed, the Diet Supp may be purchased only by Diet Center franchisees who use it solely as an integral part of the Diet Center method. Treating the Diet Supp as a separate market would thus not serve the purpose of the tying rule to protect distinct markets from anticompetitive restraints.

*Casey*, 590 F. Supp. at 1564; *see id.* at 1564 n.3 ("This may be what the [Supreme] Court had in mind when it stated [that being forced to buy a product no one otherwise would have bought does not harm competition because it does not foreclose competitors]." (citing *Jefferson Parish*, 466 U.S. at 16)).

If plaintiff's theory is not that there is no genuine demand for MOC services but that he would like to buy them not from ABR but from a competitor such as NBPAS, the result is the same. *See Casey*, 590 F. Supp. at 1564. When the product is endorsement of a physician's professional knowledge and skill, holding that the Sherman Act requires ABR to permit competitors to supply a component of that product by performing part of the physician's training or assessment would be no wiser than holding that it requires an ice cream franchisor to permit its franchisees to sell ice cream they obtain from other suppliers, or a weight-loss franchisor to permit franchisees to sell independently obtained diet pills. *Krehl*, 664 F.2d at 1354, *Casey*, 590 F. Supp. at 1564-66; *see also Jack Walters*, 737 F.2d at 705 ("Maybe Walters is capable, as it alleges, of building from parts it gets elsewhere a farm building identical to the Morton Building; but it does not follow that it can put Morton's name on it."); *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) ("Antitrust law does not compel your competitor to praise your product or sponsor your work."). To put it differently, there can "be no foreclosure of competitive access" to any market for certification from ABR, whether at the initial or MOC stage, because no one *can* provide certification in ABR's name but ABR. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978) (explaining that a professional football team's conditioning

of the purchase of regular season tickets on the purchase of preseason tickets is not tying because the team has a complete monopoly in both markets and therefore no competitors are foreclosed) (citing *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1291-92 (2d Cir. 1974) and *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974)).

The Court sees no reason why ABR "should not be allowed to modify its certification process over time." *Kenney*, 2019 WL 4697575, at *13. To the extent ABR exercises "control" over plaintiff's certification status, it is not the result of an illegal tie-in but "a function of . . . contractual powers" that plaintiff was aware of from the beginning, even if he was unaware of exactly what form MOC would take. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997); *see also Rick-Mik*, 532 F.3d at 975 ("[Where the plaintiff] knows the contractual limitations and duties before entering into the contract[, a] complaint about such contractual obligations is not an antitrust matter."). Plaintiff's allegations are not sufficient to plausibly show that initial certification and MOC are separate products for antitrust purposes, so his tying claim cannot survive defendant's motion to dismiss.

## II. SHERMAN ACT SECTION 2—MONOPOLIZATION

> Section 2 of the Sherman Act prohibits monopolization. 15 U.S.C. § 2. There are two elements to a claim under § 2: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

*United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 907 (N.D. Ill. 2019). "[L]ike its fraternal twin, Section 1," which bans only unreasonable restraints of trade, "Section 2 bans less than its literal reading suggests." *Viamedia, Inc. v. Comcast Corp.*, 335 F. Supp. 3d 1036, 1056 (N.D. Ill. 2018) (St. Eve., J.). To establish the second element of a Section 2 claim, an antitrust plaintiff must allege that the defendant sought or maintained monopoly power

by way of some sort of "anticompetitive conduct," *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). The "exclusionary practices" that qualify as "anticompetitive conduct" under Section 2 come in many forms, including "tie-in sales, . . . group boycotts, exclusive dealing, . . . or predatory pricing." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006).

Plaintiff's principal allegations of anticompetitive conduct are of tying—but, as the Court has already explained in Part I of this Opinion, plaintiff does not state a tying claim under the Sherman Act. However, plaintiff argues that ABR's conduct is anticompetitive under a number of other theories, including the following:

- First, plaintiff argues that ABR has maintained and exploited its monopoly on certification by misleading industry participants such as hospitals, insurance companies, and medical corporations to believe that MOC has a beneficial impact, when in fact there is no evidence that MOC adds any value to initial certification.

- Second, ABR has allegedly exploited its monopoly power by "locking in" radiologists—as in *Kodak*, 504 U.S. at 473, 477, in which customers were "locked in" to Kodak equipment before they had any opportunity to assess the costs of parts and service—and then "imposed a dizzying array of changes to MOC, resulting in substantial additional MOC fees and costs that could not be anticipated or quantified when radiologists obtained their initial certification." (Pl.'s Resp. Mem. at 12-13, ECF No. 41.)

- Third, ABR has allegedly refused to recognize MOC by NBPAS, which is a prohibited refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605-05 (1985).

- Fourth, plaintiff argues that "ABR's board of governors includes active participants in the markets for radiologist's services and related markets, acting consistently with their own private anticompetitive motives to restrain competition and to force radiologists to purchase MOC." (Pl.'s Resp. Mem. at 12.)

- Fifth, ABR allegedly charges supracompetitive monopoly prices for MOC.

After reciting this "litany of anticompetitive conduct", plaintiff concedes that he "takes no issue with ABR's (undisputed) monopoly in the market for initial certification, and instead . . . challenges ABR's creation and maintenance of monopoly power in the separate market for maintenance of certification." (*Id.* at 13.) But as the Court has explained above, the trouble is that there is no separate market for maintenance of certification services; rather, certification is a single product, not severable into distinct "initial" and "maintenance" components. ABR cannot have or exploit a "monopoly in a market that does not exist." *Kenney*, 2019 WL 4697575, at *13.

In particular, this dooms plaintiff's supracompetitive prices theory as well as his locking-in theory, which fails for the same reason the tying claim fails: such claims cannot stand when the plaintiff's allegations describe only a single product market. *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398-407 (3d Cir. 2016) (discussing lock-in theory in the context of tying under *Kodak*); *Kentmaster*, 146 F.3d at 694-95 (distinguishing *Kodak* in a single-product case because "the Supreme Court declared that Kodak lost only if a trier of fact could find that service and parts are two distinct products" (internal quotation marks omitted)). Further, plaintiff was aware from the beginning that he would have to pay for both "initial" certification and MOC, which crucially distinguishes this case from *Kodak*. *See Avaya*, 838 F.3d at 405 ("We agree that no antitrust liability for a *Kodak*-style attempted monopolization claim could lie after May 2008 when

customers were put on clear notice that [that they could not use an independent maintenance provider].”); *Kentmaster*, 146 F.3d at 694-95.

To whatever extent plaintiff's Section 2 claim under his other theories might be read to apply to ABR's monopoly in certification, his allegations still fail to state a plausible claim for relief. First, plaintiff's allegations that ABR misled the industry as to the value of its MOC program are too conclusory to state a claim that is plausible, rather than merely conceivable. Stripping away the complaint's conclusions and focusing on plaintiff's factual allegations, he alleges little more than that ABR has changed the MOC program from time to time and acknowledged occasionally that it made the changes because the program was flawed. But there are no factual details to support a reasonable conclusion that the MOC program provides no benefit to physicians or that ABR has lied by extolling the program's benefits. *See Kenney*, 2019 WL 4697575, at *14-15; *see also Allyn v. Am. Bd. of Med. Specialties, Inc.*, No. 5:18-CV-355, 2019 WL 297459, at *6 (M.D. Fla. Jan. 3, 2019) (“Defendants do not control the consequences of their credentialing decisions, and there is no allegation that they have yet used their influence improperly.”). Any such conclusion would be based on little more than speculation, and the allegations are therefore not sufficient to state a claim. *See Iqbal*, 556 U.S. at 681; *Twombly*, 550 U.S. at 555, 570.

Plaintiff's theory that refusing to recognize NBPAS is anticompetitive conduct under the Sherman Act does not pass muster because even a monopolist has no general duty to cooperate with rivals. *See Viamedia, Inc. v. Comcast Corp.*, No. 16-CV-5486, 2017 WL 698681, at *4-6 (N.D. Ill. Feb. 22, 2017); *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 697-99 (N.D. Ill. 2016). Plaintiff must allege that the monopolist's refusal to deal is irrational but for an anticompetitive purpose, and there is nothing irrational about declining to cooperate with a would-

be rival to help it compete. *Viamedia*, 2017 WL 698681, at \*3; *see Bd. of Oral Implantology*, 390 F. Supp. 3d at 907 (dismissing Section 1 claim against professional certifying entity because "the defendants have not . . . prevented [rival certifiers] from issuing their own certifications"). Indeed, such cooperation is more likely to be "a *problem* in antitrust, not one of its obligations." *Schor*, 457 F.3d at 610.

Finally, plaintiff's allegations concerning ABR's board of governors are purely conclusory, and therefore any claim based on them cannot survive a motion to dismiss. *Kenney*, 2019 WL 4697575, at \*14 (conclusory allegation against "unnamed board members . . . is insufficient to defeat a motion to dismiss").

The Court need not address the parties' remaining arguments concerning the Sherman Act claims because it is clear from the above that plaintiff fails to state a claim under the Sherman Act. As for the unjust enrichment claim, the parties appear to agree that it arises under Illinois law (Pl.'s Resp. Mem. at 19 n.13), and, having concluded that plaintiff fails to state a federal claim, the Court declines to exercise supplemental jurisdiction over his state claim. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("only in 'unusual cases' may a district court exercise its discretion to assert its supplemental jurisdiction" once federal claims have fallen out of the case before trial); *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

## CONCLUSION

For the reasons set forth above, the Court grants defendant's motion to dismiss [33]. Plaintiff may file an amended complaint by December 9, 2019.

**SO ORDERED.**                    **ENTERED: November 19, 2019**

_____
**HON. JORGE ALONSO**
**United States District Judge**