# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SADHISH K. SIVA, individually and<br>on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:19-cv-01407 |
| | ) | |
| AMERICAN BOARD OF RADIOLOGY, | ) | Honorable Jorge L. Alonso |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO AMERICAN BOARD OF
## RADIOLOGY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

C. Philip Curley
Cynthia H. Hyndman
Robert L. Margolis
Benjamin E. Schwab
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 663-3100
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
rmargolis@robinsoncurley.com
bschwab@robinsoncurley.com

Katrina Carroll
CARLSON LYNCH LLP
111 West Washington, Suite 1240
Chicago, IL 60602
(312) 750-1265
kcarroll@carlsonlynch.com

Michael J. Freed
Brian M. Hogan
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn IL 60015
(224) 632-4500
mfreed@fklmlaw.com
bhogan@fklmlaw.com

Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com

June 26, 2020

**TABLE OF CONTENTS**

**Page**

FACTS .................................................................................................................... 1

LEGAL STANDARD .............................................................................................. 6

ARGUMENT ........................................................................................................... 7

I.     Plaintiff States Plausible Tying Claims Under The Sherman Act ............................... 9

     A.    *Viamedia* Underscores the Importance of the History of Separate
Origin and Development of Certifications and CPD Products That
ABR Discredits .............................................................................................. 11

     B.    The FAC Alleges Well-Pled Facts Supporting Separate Demand................... 12

          1.     Radiologists differentiate between certifications and MOC ................ 12

          2.     ABR has always sold certifications and MOC separately ................... 13

          3.     ABR and ABMS recognize that certifications and MOC
are separate......................................................................................... 14

          4.     ABR bills and accounts for certifications and MOC separately .......... 15

          5.     Market structures and practices demonstrate separate demand ........... 15

          6.     Certifications and MOC are an economic necessity, without which
a successful medical career is impossible ........................................... 16

     C.    ABR's Single Product Argument Raises Fact Disputes, Improperly
Asserts Affirmative Defenses On A Rule 12(b)(6) Motion, And Is Legally
Meritless........................................................................................................ 18

          1.     ABR asserts "facts" outside the FAC and misrepresents FAC
allegations, creating factual disputes that cannot be resolved on a
motion to dismiss ............................................................................... 18

          2.     ABR's business justification arguments constitute affirmative
defenses not appropriate for consideration on a Rule 12(b)(6)
motion ................................................................................................. 22

i

3.     Even if considered, ABR's assertion that MOC is a "component of," "modifies," "improves," or "complements" certifications raises fact issues ........................................................................................... 22

II.    ABR's Anticompetitive Conduct Causes Antitrust Injury ........................................... 24

III.   The Antitrust Claims Are Timely ................................................................................. 26

IV.   Plaintiff States a Claim For Unjust Enrichment ......................................................... 27

CONCLUSION ....................................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*Allyn v. Am. Bd. Of Med. Specialties, Inc.,* No. 5:18-cv-00355-JSM-PRL,
    2019 U.S. Dist. LEXIS 10805 (M.D. Fla. Jan 3, 2019) ...................................................... 11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................................ 6

*In re Broiler Chicken Antitrust Litig.,*
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ............................................................................... 27

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,*
    140 F.3d 494 (3d Cir. 1998) ............................................................................................ 18

*Brunswick Corp. v. Riegel Textile Corp.,*
    752 F.2d 261 (7th Cir. 1984) ........................................................................................... 26

*Busse v. Am. Bd. of Anest., Inc.,* No. 92 C 5613,
    1992 U.S. Dist. LEXIS 18948 (N.D. Ill. Dec. 11, 1992) ..................................................... 16

*Chatham v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co.),*
    No. 05 C 4742, No. 05 C 2623,
    2006 U.S. Dist. LEXIS 92169 (N.D. Ill. Dec. 18, 2006) ..................................................... 28

*Chicago Prof'l Sports Ltd. P'ship v. Nat. Basketball Ass'n,*
    961 F.2d 667 (7th Cir. 1992) ........................................................................................... 25

*Collins v. Assoc. Pathologists, LLC,*
    844 F.2d 473 (7th Cir. 1988) ........................................................................................... 20

*Collins Inkjet Corp. v. Eastman Kodak Co.,*
    781 F.3d 264 (6th Cir. 2015) ...................................................................................... 16-17

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984) ........................................................................................................ 16

*Cushing v. City of Chicago,*
    3 F.3d 1156 (7th Cir. 1993) ............................................................................................. 18

*Djebo Sales LLC v. Houghton Mifflin Harcourt Publ'g Co.,* No. 14-4657,
    2015 WL 1969380 (D. N.J. Apr. 29, 2015) ..................................................................... 20

*Djebo Sales v. Houghton Mifflin Harcourt Publ'g Co.,* No. 14-4657,
    ECH Dkt. No. 73 (D.N.J. Jan 28, 2016) ...........................................................................20

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992) ................................................................................ *passim*

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.*,
    766 F.2d 1007 (7th Cir. 1985) ............................................................... 27

*Gen. Cas. Co. of Wis. v. Techloss Consulting & Restoration*, No. 1:18-cv-6062,
    2020 U.S. Dist. LEXIS 85703 (N.D. Ill., May 15, 2020) ...................... 27

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................. *passim*

*Jovic v. L-3 Servs., Inc.*,
    69 F. Supp. 3d 750 (N.D. Ill. 2014) ..................................................... 26

*Kenney v. Am. Bd. of Internal Med.*, No. 18-5260,
    412 F. Supp. 3d 530 (E.D. Pa. 2019) ................................................... 20

*Kentmaster Manu. Co. v. Jarvis Prods. Corp.*,
    164 F.3d 1243 (9th Cir. 1998) ............................................................. 24

*Levenstein v. Salafsky*,
    164 F.3d 345 (7th Cir. 1998) ............................................................... 19

*Liberman v. Am. Ost. Ass'n*, No. 13-15225,
    2014 U.S. Dist. LEXIS 153012 (E.D. Mich. Oct. 29, 2014) ................ 16

*Mathews v. Lancaster Gen. Hosp.*,
    87 F.3d 624 (3d Cir. 1996) ................................................................. 25

*McDonald v. Adamson*,
    840 F.3d 343 (7th Cir. 2016) ............................................................... 22

*Mozart Co. v. Mercedes-Benz of N.A., Inc.*,
    833 F.2d 1342 (9th Cir. 1987) ............................................................. 22

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ., Inc.*,
    63 F.3d 1540 (10th Cir. 1995) .......................................................... *passim*

*Nat'l Union Fire Ins. Co. v. DiMucci*,
    2015 IL App (1st) 122725 ................................................................... 28

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
    585 F.2d 821 (7th Cir. 1978) ............................................................... 21

*Pace Am., Inc. v. Elixir Indus.*, No. 06 C 4661,
2009 U.S. Dist. LEXIS 6281 (N.D. Ill. Jan. 27, 2009) ........................................ 27

*Phila. Indem. Ins. Co. v. Pace Sub. Bus Serv.*,
2016 IL App (1st) 151659 ........................................................................................ 28

*Pine Top Receivables of Ill., LLC, v. Banco de Seguros Del Estado,* No. 12 C 6357,
2013 U.S. Dist. LEXIS 81516 (N.D. Ill. June 11, 2013) .................................... 6-7

*Pirelli Armstrong Tire Corp. Ret. Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) .................................................................................. 18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .................................................................................... 21

*Reed v. Palmer*,
906 F.3d 540 (7th Cir. 2018) .................................................................................... 6

*Reifert v. S. Cent Wis. MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ............................................................................ 10, 26

*Richards v. Mitcheff*,
696 F.3d 635 (7th Cir. 2012) ............................................................................. 6, 26

*Service & Training, Inc. v. Data Gen. Corp.*,
963 F.2d 680 (4th Cir. 1992) ............................................................................. 23-24

*Stevens v. Interactive Fin. Advisors, Inc.,* No. 11 C 2223,
2015 U.S. Dist. LEXIS 21518 (N.D. Ill. Feb. 24, 2015) .................................... 27

*Tamayo v. Blagojevich*,
526 F.3d 1074 (7th Cir. 2008) .................................................................................. 6

*Taylor v. Docherty, No. 16 C 4656,*
2018 U.S. Dist. LEXIS 84357 (N.D. Ill. May 21, 2018) ...................................... 6

*Thompson v. Metro. Multi-List, Inc.*,
934 F.2d 1566 (11th Cir. 1991) .............................................................................. 15

*United States v. LaSalle Bank, N.A.,* No. 07 C 6196,
2008 U.S. Dist. LEXIS 60756 (N.D. Ill. July 29, 2008) ...................................... 6

*United States v. Microsoft Corp.*,
253 F.3d 34 ................................................................................................................ 17

*United States v. Spectrum Brands*,
    924 F.3d 337 (7th Cir. 2019) ............................................. 26

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ...................................... *passim*

*Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*,
    850 F.2d 803 (1st Cir. 1988) ............................................. 26

*Weslowski v. Zugibe*,
    96 F. Supp. 3d 308 (S.D.N.Y. 2015) ..................................... 6

*Western Power Sports, Inc. v. Polaris Indus. Partners L.P.,* No. 90-35359,
    1991 U.S. App. LEXIS 29993 (9th Cir. Dec. 11, 1991) ....................... 26

*Young v. Lehigh Corp.,* No. 80 C 4376,
    1989 U.S. Dist. LEXIS 11575 (N.D. Ill. Sept. 26, 1989) ..................... 26

*Zak v. Bose Corp.*, 2019, No. 17-cv-02928,
    2019 U.S. Dist. LEXIS 54871 (N.D. Ill. Mar. 31, 2019) ...................... 28

## Statutes and Rules

Sherman Act .......................................................... *passim*

Fed. R. Civ. P. 8(a) ...................................................... 6

Fed. R. Civ. P. 12(b)(6) .............................................. *passim*

## Other

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and*
    *Their Application* (4th Ed. 2018) ................................. *passim*

Plaintiff has taken advantage of the opportunity provided by the Court and filed his First Amended Class Action Complaint ("FAC") that completely cures the shortcomings identified by the Court in its Memorandum Opinion and Order of November 19, 2019. The FAC alleges:

- Sufficient facts that, taken as true, support a showing that certifications and "maintenance of certification" ("MOC") are separate products, rather than MOC being a "component" of certifications;

- Certifications and MOC are sold separately by Defendant American Board of Radiology ("ABR");

- Demand for "MOC services" independent from ABR forcing radiologists to buy MOC or have their certifications revoked;

- Severing ABR's tie will still allow ABR to determine its own standards for certifications and MOC; and

- Sufficient facts that, taken as true, support a showing that ABR's "control" over MOC arises from the coercive nature of the tie.

(*See* Dkt. #48, at 6-12) ("Op. at __"). Therefore, the motion to dismiss should be denied.

## FACTS

Certifications assess postgraduate medical education of new residency graduates. (¶¶ 3, 48, 56).[1] ABR has sold certifications to radiologists since 1934. (¶¶ 3, 40). ABR is the monopoly supplier of certifications. (¶¶ 3, 285, 289, 331, 333, 344, 357). Radiologists can only buy certifications from ABR within a limited time after residency graduation. (¶¶ 56, 299). To buy certifications, residency graduates take a uniform (standardized) ABR examination. (¶¶ 7, 41, 54). The American Board of Medical Specialties ("ABMS") calls certification an "early career event" and an ABMS CEO in a 2006 medical journal article describes certifications as "a one time,

---

[1]    References to "¶ ___" are to paragraphs of the First Amended Class Action Complaint, Dkt. #55. After ABR began selling MOC in or about 2006 it changed terminology and instead of "certifications" began referring to "initial" certifications. The FAC uses "certifications" as ABR did for over sixty years. (¶¶ 3, 4, 50-51, 135, 143).

snapshot assessment." (¶¶ 48, 52; s*ee also* ¶¶ 25-28, 48-56 (history of medical specialty boards, ABMS, and certifications)).[2] Certifications are the tying product in Plaintiff's Sherman Act claims. (¶¶ 2, 3, 5).

The tied product is ABR's maintenance of certification. (¶¶ 2, 4, 5). ABR began selling MOC in or around 2006. (¶ 4). ABR forces radiologists to buy MOC throughout their careers or have their certifications revoked. (¶¶ 5, 7, 140-141, 201, 264, 267, 278, 287, 360; s*ee also* ¶¶ 130-146 (history of MOC)). MOC is a continuing professional development ("CPD") product. (¶¶ 2, 4, 135). CPD products such as MOC provide "individual lifelong learning" services to radiologists after residency graduation and certification. (¶¶ 6-7, 46, 96, 141, 169, 300). ABMS refers to MOC as "Continuous Professional Development." (¶ 139). ABR promotes MOC as individualized. (¶¶ 7, 141, 301). Certifications and MOC are separate and distinct and not interchangeable or a component of one another. (¶¶ 144-146, 250-254, 310; *see also* ¶¶ 281-316).

MOC is no different from other CPD products that promote lifelong learning except that radiologists who do not buy ABR's CPD product have their certifications revoked. (¶¶ 6-7, 94-96, 140-141, 163, 201, 264, 287, 304, 360). In addition to ABR, other CPD vendors include continuing medical education ("CME") providers, medical schools, professional societies and colleges, hospitals, clinics, physician groups, health systems, local medical associations, and other medical organizations. (¶¶ 6, 23-24, 266, 289; s*ee also* ¶¶ 94-129 (history of CPD products and CPD vendors)). MOC and other CPD products and services include classes, lectures, symposia, conferences, video or digital presentations, online learning, and self-assessment, including testing. (¶¶ 6, 100, 163). ABR has changed MOC repeatedly over the years, including the testing

---

[2]    ABMS is an umbrella organization of 24 medical specialty boards ("Member Boards"), including ABR. (¶¶ 21, 29-31). ABR and the other Member Boards control ABMS and establish ABMS policies, practices, and procedures, including those related to certifications and CPD products. (¶¶ 32-34, 39).

requirements. (¶¶ 163-197, 255-258).

Certifications and MOC have different purposes and ABR has identified them as separate programs on Form 990s filed with the IRS. (¶¶ 170, 297, 315). ABR Bylaws acknowledge the different objectives of certifications and MOC. (¶46, 309). The ABR website has separate sections for certifications and MOC, describing the different processes, schedules, and requirements for each. (¶ 308). An ABR white paper confirms MOC is not, as the name implies, "maintenance" of certification but a CPD product: "The intent of the [MOC] examinations is to reinforce the process of individual lifelong learning, rather than to serve as recertification examinations." (¶ 169).

ABR charges radiologists separately for certifications and MOC, and accounts for them separately. (¶¶ 172, 177, 236, 305, 306). ABR sells certifications and MOC to radiologists at different times during their careers. (¶¶ 305, 313, 363; *see also* ¶¶ 249-59 (Dr. Siva)). New residency graduates pay a one-time certification fee to ABR upon graduation, and are charged later for MOC throughout the rest of their careers. (¶¶ 7, 56, 95, 250-255, 299, 314). ABR has continued to sell certifications separately since it began selling MOC. (¶ 290). ABR's decades-long monopoly in certifications before it sold MOC demonstrates MOC is separate and not essential to the success of ABR's certification product. (¶ 316).

ABR carves out an exception for "grandfathers" that bought certifications before ABR sold MOC, who are not required to purchase MOC to keep their certifications. (¶¶ 5, 152-155, 310). Up to 50% of radiologists have been "grandfathered" from being forced to buy MOC. (¶ 162). According to a 2019 survey of over 20,000 radiologists, only 14% of "grandfathers" choose to buy MOC, proof that as consumers they do not consider MOC to be a component of certifications, or that MOC and certifications together form a single product. (¶¶ 156-160, 311). "Grandfathers" exempted from MOC buy other CPD products for lifelong learning from other vendors to satisfy

licensure requirements and other professional commitments. (¶¶ 23, 312). ABR does not revoke the certifications of "grandfathers" who buy MOC but then fail its testing requirements. (¶¶ 153, 311).[3]

Radiologists differentiate between certifications and CPD products and services such as MOC, and separate demand exists for each. (¶¶ 11, 264, 282-84, 287, 289, 297-298, 313, 330, 361). Radiologists bought CPD products and services from other vendors for decades before ABR sold MOC. (¶¶ 11, 111, 113, 164-166, 285, 288-289). ABR likewise sold certifications for decades without selling its own CPD product. (¶¶ 11, 285, 288, 292). Radiologists prefer to buy CPD products for lifelong learning from others rather than being forced to buy MOC. (¶¶ 264, 286-287). Because there is separate and sufficient demand for certifications and CPD products such as MOC, it is efficient to sell them separately. (¶ 284).

Certifications are not voluntary and are instead an economic necessity, without which a successful medical career is impossible. (¶¶ 10, 57-93, 248, 263, 319, 328). Radiologists whose certifications are revoked by ABR because they do not buy MOC are no longer eligible for admitting and other privileges by hospitals, health systems, practice groups, and medical corporations and/or lose employment. (¶¶ 60-75). They are also no longer eligible to participate in insurance networks. (¶¶ 76-86). The CEO of the largest Member Board wrote in 1991 that certification, "is no longer an option for the physician entering the marketplace." (¶ 91). A later CEO of the same Member Board agreed, writing in 2008: "many physicians really feel that board

---

[3]    Some "grandfathers" buy MOC due to other professional commitments even though they are not required to do so by ABR to "maintain" their certifications. For example, for many years ABR did not require "grandfathers" who held leadership and volunteer positions to buy MOC, but it does so now for public relations purposes. (¶¶ 158, 161). Some medical schools may also require "grandfathered" faculty members to buy MOC. (¶ 158). Referring to being exempted from MOC, one Member Board CEO admitted, "Grandfathering is a really vexing challenge. It's difficult to defend …" (¶ 27).

certification is not optional," specifically noting its "significant impact in the marketplace." *Id*. A 2019 article in a peer-reviewed medical journal concludes, "Board certification, which started as a voluntary achievement and remains so in theory has become involuntary in practice, making participation in MOC programs mandatory for many if not most physicians in order to maintain employment and clinical privileges, or receive reimbursement." (¶ 93).

No causal relationship has been established between MOC and a beneficial impact on doctors, patients, or the public. (¶ 209, 365). Studies demonstrate MOC does not result in improved patient outcomes. (¶¶ 210-228). One study concludes: "there is a paucity of high-quality data" supporting the "assertion that maintenance of certification improves quality of care." (¶ 214). Another study confirms, "In other ABMS specialties, however, there is only scant or equivocal evidence of MOC in terms of patient outcomes. [footnote omitted] We are aware of no such studies in radiology." (¶ 228; *see also* ¶ 208). Physician surveys are to the same effect. (¶¶ 229-233).

This Class Action is brought on behalf of radiologists who, like Plaintiff, are forced by ABR to buy MOC or have their certifications revoked. (¶ 14).[4] In addition to money damages, Plaintiff asks that ABR be enjoined from revoking certifications of radiologists who do not buy MOC. (¶¶ 12, 376). Plaintiff does not contend ABR should be prevented from determining its own standards or criteria for certification, or be required to accept any other CPD product or services as a substitute for certifications or MOC. (¶ 12). There is no legitimate business or pro-competitive justification for ABR's tying of certifications and MOC. (¶ 355).

---

[4]     For Plaintiff's background and individual allegations, *see* ¶¶ 1, 20, 247-269.

# <u>LEGAL STANDARD</u>

Under Rule 8(a), "[a] plaintiff's complaint need only provide a short and plain statement" of a claim entitling the pleader to relief, "sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (internal citations omitted). ABR does not contend the FAC fails to provide fair notice. In an antitrust context, Rule 8(a) "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

On a Rule 12(b)(6) motion, allegations are to be "taken as true and considered in the light most favorable" to plaintiff. *Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018). The Court must also draw "all possible inferences in [plaintiff's] favor." *Tamayo*, 526 F.3d at 1081. "[J]udges must not make findings of fact at the pleading stage … and cannot reject a complaint's plausible allegations by calling them 'unpersuasive.' Only a trier of fact can do that, after a trial." *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). As a result, when, as here, a "motion to dismiss is premised on factual assertions," the motion "must be denied." *United States v. LaSalle Bank, N.A.*, No. 07 C 6196, 2008 U.S. Dist. LEXIS 60756, at *9 (N.D. Ill. July 29, 2008).

ABR suggests that even though Dr. Siva was permitted to amend, "law of the case" should apply to the "particular allegation" that "ABR sells its certification product separately from MOC." (ABR 6, n.7). It relies on a single case outside the district, however, that holds the opposite: "to the extent that Plaintiff has offered … factual allegations that arguably address the deficiencies the Court previously identified, the Court will consider those claims anew." *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015). This is consistent with the approach in this district. *E.g.*, *Taylor v. Docherty*, No. 16 C 4656, 2018 U.S. Dist. LEXIS 84357, *8 (N.D. Ill. May 21, 2018) (plaintiff bolstered previously dismissed claim "with additional allegations"); *Pine Top*

*Receivables of Ill., LLC, v. Banco de Seguros Del Estado*, No. 12 C 6357, 2013 U.S. Dist. LEXIS 81516, *6 n. 2 (N.D. Ill. June 11, 2013) (same).

<u>**ARGUMENT**</u>

Ignoring facts will not make them go away. ABR ignores the additional fact allegations the Court instructed were necessary to support Plaintiff's claims. A listing of newly-alleged facts sorted by the prior concerns noted by the Court is attached as Exhibit 1 hereto.

The FAC's additional allegations now expressly make clear that: (1) MOC is a CPD product that, like other CPD products and as described by ABR itself, promotes "individual lifelong learning" and does not assess the postgraduate medical education of new residency graduates; (2) Plaintiff has added abundant well-pled and specific fact allegations showing the separate purposes of certifications and CPD products such as MOC, as well their separate origin and development; (3) CPD products have existed apart from certifications for decades, and there is separate consumer demand for certifications and CPD products such as MOC; (4) Dr. Siva does not seek to compel ABR's "endorsement" of other CPD products (*see* Op. at 10, 12), but only to prevent ABR from revoking certifications of radiologists who do not buy ABR's own CPD product; and (5) radiologists are forced to buy MOC due to the coercive nature of ABR's tie.

ABR also virtually ignores the new Sherman Act, Section 2 tying opinion, *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), in which the Seventh Circuit reversed summary judgment for defendant, rejecting the same single product arguments ABR makes here. First, *Viamedia* holds that whether there is separate demand must be assessed before the tie is imposed, and not after. *Viamedia*, 951 F.3d at 469 ("the market must be 'assessed at the pre-contract rather than post-contract stage'") (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An

7

Analysis of Antitrust Principles and Their Application, ¶ 1802d6, at 89 (4th Ed. 2018) ("Areeda & Hovenkamp")).

This guts both premises of ABR's single product theory: (1) that certifications should be analyzed post-MOC, with MOC viewed as a component of a "multi-stage" process (ABR at 8), rather than *before* ABR imposed its tie forcing radiologists to buy MOC or have their certifications revoked; and (2) as to MOC, "the relevant inquiry" is whether there currently is conflated demand for a single CPD product (MOC) and certifications as a result of ABR's tie (*id*.), rather than inquiring whether there was separate demand by radiologists for CPD products *before* ABR tied certifications and MOC. *See Viamedia*, 951 F.3d at 469 (consumers "viewed the services as separate prior into entering into their present [tying] contracts with Comcast"). The *Viamedia* imperative to assess demand before the tie makes perfect sense because focusing on demand *after* the tie is forced on consumers inevitably rewards the defendant who has already successfully reduced competition, the very goal of the illegal tie. *Viamedia* makes clear that a defendant like ABR who forces consumers to purchase a tied product, cannot then parlay its own coercion into evidence of lack of separate demand for a product that the victimized consumers would not otherwise purchase, exactly what ABR argues here. (ABR at 8-9, 11).

An overarching theme of *Viamedia* is that a court may not arrogate to itself the role of factfinder at the summary judgment stage, a cautionary tale of even greater significance when considering a motion to dismiss. Here, there is a fact issue whether certifications and CPD products such as MOC are separate, and "[t]he fact that buyers may wish to purchase and use two complementary products together does not, in and of itself, convert the two separate products into a single product." *Viamedia*, 951 F.3d at 469. This lays waste to ABR's argument that certifications and MOC must be viewed as a single product because MOC is the only CPD product radiologists

can buy to "maintain" certifications. (ABR at 9). That ABR has manipulated its own CPD product to function in a complementary way with certifications may be innovative, but that "does not, in and of itself," convert certifications and MOC into a single product. Areeda & Hovenkamp, ¶ 1746, at 231 ("[I]nnovation need not always take the form of building a better mousetrap. Instead, the 'innovation' may be an anticompetitive tie that no one has tried before."); *id.* ¶ 1744h, at 200 (noting "unremarkable view that things can be separate products even if they are complements").

*Viamedia* also teaches that whether radiologists are forced to buy MOC presents a fact question dependent on the "the realities of the parties' dealings and the economic realities of the market." 951 F.3d at 471 n. 17. This ravages ABR's argument that "forcing" turns on whether it somehow "controls" third-party hospitals and insurance companies who make privilege and coverage decisions. (ABR at 9). Instead, the FAC's well-pled and plausible allegations of economic necessity, similar to those in *Viamedia*, can only be resolved by the trier of fact.

Finally, business justification defenses dominate ABR's single product argument. (ABR at 3, 8, 10). But to the extent those defenses should even be considered at this time (they should not), *see* p. 22, *infra*, *Viamedia* holds that "balancing anticompetitive effects against [a defendant's] hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings." 951 F.3d at 460. At issue is whether Plaintiff has addressed the concerns noted previously by the Court, not whether ABR at this early stage disputes Plaintiff's fact allegations or can assert its own fact-based business justification defenses.

I.   **Plaintiff States Plausible Tying Claims Under The Sherman Act.**

To state a *per se* tying claim, a plaintiff must show: (1) two distinct products or services, (2) that defendant has sufficient economic power in the tying market, (3) a not insubstantial amount of interstate commerce is affected, and (4) that the tying seller has an economic interest in the tied

product. *Reifert v. S. Cent Wis. MLS Corp.*, 450 F.3d 312, 316-17 (7th Cir. 2006). ABR's motion disputes only the first element, whether the FAC contains fact allegations supporting separate products. Plaintiff also brings an alternative a rule of reason tying claim by pleading the above elements, and an unreasonable harm to competition that is not outweighed by procompetitive justifications. (¶¶ 348-366). It is plausible that a monopolist such as ABR would leverage its market power in a tying product (certifications) to gain an advantage in a tied product (MOC). *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 478 (1992) (use of monopoly power in tying product to gain advantage in tied product "facially anticompetitive").

"Whether one or two products are involved turns … on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984). In assessing whether separate demand exists, courts look at whether the products are "distinguishable in the eyes of buyers" and "separately priced and purchased from the buyer's perspective." *Id.* at 19-20. As discussed below, the Supreme Court has identified several factors courts examine to determine consumer demand, including "more readily observed facts [such] as actual consumer requests and market practices." Areeda & Hovenkamp, ¶ 1745c, at 202 (describing factors identified by *Jefferson Parish* and *Eastman Kodak*).

Courts should not, as ABR urges here, disregard "readily observed facts" in favor of self-serving arguments about the "nature" of the products. Areeda & Hovenkamp, ¶ 1741a, at 170 ("Courts often decide whether two allegedly tied items 'really' constitute a single product as if the question involved natural law, intuition, or some other inquiry divorced from the aims of tying law … Such metaphysical or intuitive inquiries are inherently uncertain and are typically useless for analyzing ties."). ABR avoids engaging Plaintiff's well-pled allegations of separate demand, and

instead pushes useless "metaphysical or intuitive inquiries" wholly dependent upon self-serving characterizations of what ABR contends certifications "really" are. (ABR at 7, 8).[5]

### A. *Viamedia* Underscores the Importance of the History of Separate Origin and Development of Certifications and CPD Products That ABR Discredits.

ABR calls "irrelevant" Plaintiff's detailed fact allegations of the history of ABR, ABMS, and certifications separate from CPD products; the origin and development of CPD products and services separate from certifications; and the history of MOC as a CPD product separate from certifications. (ABR at 8). The Seventh Circuit in *Viamedia*, however, explained that historical development of the tying and tied products is essential to understanding tying claims, and made a deep dive into the history of the "markets' competitive dynamics," rightly focusing on the period before the tie was implemented. 961 F.3d at 436-444. Far from "irrelevant," the separate origin and historical development of certifications and CPD products such as MOC is precisely where the focus belongs.

That history lays bare that certifications have always been "an early career event" and "a one-time snapshot assessment" of new residency graduates, distinct from CPD products that center on "individual lifelong learning." (¶¶ 7, 48, 52, 141). Before MOC, certifications were seen as "lifetime" because they measured a radiologist's singular accomplishment of successful completion of postgraduate medical education. So too after MOC, but for ABR's manipulation, certifications remain "lifetime" because postgraduate medical education cannot be revoked years

---

[5]    ABR's reliance on *Allyn v. Am. Bd. Of Med. Specialties, Inc.*, No. 5:18-cv-00355-JSM-PRL, 2019 U.S. Dist. LEXIS 10805 (M.D. Fla. Jan 3, 2019), *adopted* 2019 U.S. Dist. LEXIS 10404 (M.D. Fla. Jan. 23, 2019), is misplaced. (ABR at 10). The claim there was dismissed on ripeness grounds because the challenged program had not been implemented. *Id.* at *10-11 ("Plaintiffs' antitrust claims are, therefore, not ripe and due to be dismissed"). To the extent the court discussed the substance of the claim, it noted the lack of allegations of "market power" and "forcing," and that "it [was] not clear from the complaint" what separate products were alleged. *Id.* at *14. Here, by contrast, ABR's monopoly power in certifications is uncontested, forcing is well-pled, and the separate products are clearly identified.

or decades later, as ABR purports to do by forcing radiologists to buy MOC or forfeit their certifications.

In order to sell MOC, which ABR admits "would never be successful on its own merits" (ABR 8-9, 11), ABR stopped selling "certifications" after more than sixty years and instead began selling what it now called "initial" certifications. (¶¶ 50-51, 142-146). But only the name changed; "initial" certifications continue to assess the postgraduate medical education of new residency graduates. The revised nomenclature does, however, allow ABR to brand its CPD product "maintenance" of certification, thereby tying certifications and MOC. The FAC exposes ABR's semantic ploy.

### B. The FAC Alleges Well-Pled Facts Supporting Separate Demand.

#### 1. Radiologists differentiate between certifications and MOC.

Separate demand exists when consumers "differentiate between" the tying and tied products. *Jefferson Parish*, 466 U.S. at 22-23 ("patients or surgeons often request specific anesthesiologists to come to a hospital and provide anesthesia"). *See also Viamedia,* 951 F.3d at 469 (buyers "viewed the services as separate"). The FAC alleges numerous facts showing consumers (radiologists) differentiate between certifications and CPD products such as MOC:

¶¶ 2, 4, 6-7, 95, 96, 135, 141 -- MOC is a CPD product designed to provide "individual lifelong learning" services to radiologists after residency graduation and certification.

¶¶ 11, 111, 113, 164-166, 285, 288-289 -- Radiologists bought CPD products and services from other vendors for decades before ABR sold MOC.

¶¶ 11, 285, 288, 292 -- ABR sold certifications for decades without selling its own     CPD product.

¶¶ 23, 312  -- Since ABR began selling MOC, "grandfathers" and other radiologists have continued to buy other CPD products separate from certifications to satisfy licensure requirements and other professional commitments.

¶¶ 201, 264, 286-287, 330 -- Radiologists prefer to buy CPD products and services for lifelong learning from others rather than being forced to buy MOC.

¶¶ 156-160, 311 -- Almost all "grandfathered" radiologists choose not to buy MOC, proof that as consumers, tens of thousands of radiologists do not consider MOC to be a component of certifications, or that MOC and certifications together form a single product.

¶¶ 250, 255-256 -- Dr. Siva purchased MOC separately from certifications.

## 2. ABR has always sold certifications and MOC separately.

Separateness is also demonstrated by evidence that the two products "have been sold separately in the past and still are sold separately." *Eastman Kodak* 504 U.S. at 462. *See also Viamedia*, 951 F.3d at 470; *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ., Inc.*, 63 F.3d 1540, 1547 (10th Cir. 1995) (products marketed separately "for over a decade" and still sold separately). The FAC alleges that ABR has always sold certifications and CPD products separately:

¶¶ 3, 4 -- ABR sold certifications from 1934 to the present, and did not sell MOC or any other CPD product until 2006.

¶¶ 11, 285, 288, 292 -- ABR sold certifications for decades without selling its own CPD product.

¶ 290 -- ABR continued selling certifications separately after it began selling MOC.

¶¶ 249-259, 305, 313, 363 -- ABR sells certifications and MOC to radiologists at different times in their careers.

¶¶ 56, 299 -- Certifications can only be purchased from ABR within a limited time after residency graduation.

¶¶ 7, 95 -- MOC can only be bought after purchase of certifications.

¶¶ 7, 56, 95, 250-255, 314 -- New residency graduates pay a one-time certification fee upon graduation, after which ABR then charges radiologists for MOC throughout the remainder of their careers.

¶ 316 -- ABR's decades-long monopoly in certifications before it began to sell MOC demonstrates MOC is separate and not essential to ABR's certification product.

### 3. ABR and ABMS recognize that certifications and MOC are separate.

ABR's own recognition that certifications and MOC are different also demonstrates that radiologists, including those in charge of ABR, differentiate between the two products. According to ABR, certifications are sold to new residency graduates to "determine if candidates have acquired [the] requisite standard of knowledge skill and understanding essential to the practice of diagnostic radiology, radiation oncology and medical physics." (¶ 168). MOC's purpose, on the other hand, as explained in an ABR white paper is to, "reinforce the process of individual lifelong learning, rather than to serve as recertification examinations." (¶ 169). ABR has identified certification and MOC as separate programs on IRS Form 990s. (¶ 170). ABR's exemption of tens of thousands of "grandfathers" who bought certifications from the requirement of buying MOC also concedes certifications and MOC are separate. (¶¶ 152-153, 161). *See Viamedia*, 951 F.3d at 474 (defendant's sale of tying product alone shows there "are indeed separate products").

ABMS, whose policies, practices and procedures related to certifications and MOC are established by ABR and the other Member Boards (¶¶ 33-34), also considers certifications and MOC to be separate. For example, while the ABMS website describes certifications as an "early career event," MOC is described as "Continuous Professional Development." (¶¶ 48, 139). Other fact allegations demonstrating ABR and ABMS recognition of separateness include:

¶¶ 130-146 -- History of MOC as a CPD product separate from certifications.

¶¶ 46, 309 -- ABR Bylaws recite different objectives of certifications and MOC.

¶ 308 -- ABR website has separate sections for certifications and MOC, describing the different processes, schedules, and requirements for each.

¶¶ 153, 200, 311 -- ABR does not revoke certifications of "grandfathers" who buy MOC but then fail its testing requirements.

¶ 52 -- Former ABMS CEO in a 2006 medical journal article describes certifications as a "one time, snapshot assessment."

¶¶ 131-132 – A Member Board sold its own CPD product separately from certifications.

¶¶ 35-36 -- ABMS has separate oversight committees for certifications and MOC.

### 4. ABR bills and accounts for certifications and MOC separately.

Courts also consider whether the consumer is billed or charged separately for the tied product. *Jefferson Parish*, 466 U.S. at 22 ("anesthesiological services are billed separately"); *Multistate Legal Studies,* 63 F.3d at 1547 (separate fees); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1575 (11th Cir. 1991) (same). ABR has always charged radiologists separately for certifications and MOC. (¶¶ 177, 305). ABR also accounts for them separately. (¶¶ 236, 306).

### 5. Market structures and practices demonstrate separate demand.

Courts examine market structure and practices as an indication whether there are efficiencies to offering the tied and tying products separately, thus supporting separate demand. *See Eastman Kodak*, 504 U.S. at 462 ("service and parts have been sold separately in the past [by others] and are still sold separately"); *Jefferson Parish*, 466 U.S. at 23 n. 39 ("other hospitals often permit anesthesiological services to be purchased separately"); *Viamedia*, 951 F.3d at 469 (competitor offered only the tied product "for almost two decades"). The FAC contains many fact allegations of market structure and practices demonstrating separate demand:

¶¶ 25-28, 48-56 -- History of ABR, ABMS, and certifications separate from CPD products.

¶¶ 94-129 -- History of CPD products and services and CPD vendors separate from certifications.

¶¶ 11, 285, 288, 292 -- ABR sold certifications for decades without selling its own CPD product.

¶ 316 -- ABR's decades-long monopoly in certifications before it sold MOC demonstrates MOC is separate and not essential to ABR's certification product.

¶¶ 11, 111, 113, 164-166, 285, 288-289 -- Radiologists bought CPD products and services from other vendors for decades before ABR sold MOC.

¶¶ 201, 264, 286-287, 330 -- Radiologists prefer to buy CPD products and services for lifelong learning from others rather than being forced to buy MOC.

¶ 284 -- It is efficient for certifications and MOC to be sold separately because there is separate and sufficient demand.

### 6. Certifications and MOC are an economic necessity, without which a successful medical career is impossible.

ABR argues in support of a single product that certifications and MOC are voluntary. (ABR at 3, 11-12). Courts recognize, however, that economic reality dictates whether a purchase is forced. Thus, *Viamedia* holds forcing to be a fact issue. 951 F.3d at 470-74 ("a seller is not immunized from a tying claim if there is a factual dispute as to whether the buyer wished to purchase" the tied product "from the defendant with market power" in the tying product). The Seventh Circuit specifically found that the purported option of retail cable providers bringing the tied product (ad rep services) in-house was "not a practical option," and that it "cannot affirm summary judgment by overlooking [the] evidence about the realities of the parties' dealings and the economic realities of the market." *Id*. at 471 n. 17. Similarly, the purported option offered by ABR here, that radiologists simply not buy certifications and MOC defies, economic reality and is "not a practical option."

Courts have found certification to be an economic necessity when hospital privileges or insurance hang in the balance for doctors. *Busse v. Am. Bd. of Anest., Inc.*, No. 92 C 5613, 1992 U.S. Dist. LEXIS 18948, *8 (N.D. Ill. Dec. 11, 1992) (certification an economic necessity when necessary to access area hospitals); *Liberman v. Am. Ost. Ass'n*, No. 13-15225, 2014 U.S. Dist. LEXIS 153012, *16-17 (E.D. Mich. Oct. 29, 2014) (same for insurance coverage). *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 760 (1984) (Sherman Act "aimed at substance rather than form"); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272

(6th Cir. 2015) (unlawful ties need not be explicit); *United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001) (en banc) (monopolist barring a single cost-effective means of distribution).

For the same reasons that certifications are not "voluntary" neither is MOC, as a result of ABR forcing radiologists to buy MOC or have their certifications revoked. Areeda & Hovenkamp, ¶ 1752e, at 295 (tying present when defendant utilizes a consumer's desire (here, radiologists' desire not to have their certifications revoked) to "constrain improperly their choice" between products). The FAC alleges numerous facts demonstrating that certifications and MOC are an economic necessity without which a successful medical career is impossible:

¶¶ 57-90 -- Detailed explanation of how and why certifications are an economic necessity.

¶¶ 60-75 -- Radiologists whose certifications are revoked because they do not buy MOC no longer eligible for privileges from hospitals, health systems, practice groups, and medical corporations and/or lose employment.

¶¶ 76-86 -- Radiologists whose certifications are revoked because they do not buy MOC no longer eligible to participate in insurance networks.

¶ 91 -- First CEO of the largest Member Board wrote in the *Annals of Internal Medicine* in 1991 that certification, "is no longer an option for the physician entering the marketplace."

¶ 91 – A later CEO of the same Member Board wrote in a medical journal article in 2008: "many physicians really feel that board certification is not optional" and noted its "significant impact in the marketplace."

¶ 93 -- A 2019 article in a peer-reviewed medical journal concludes that, "Board certification, which started as a voluntary achievement and remains so in theory has become involuntary in practice, making participation in MOC programs mandatory for many if not most physicians in order to maintain employment and clinical privileges, or receive reimbursement."

¶¶ 156-158 -- Survey of 20,000 radiologists confirms MOC is not voluntary.

¶ 207 -- Ninety percent of 7,007 doctors in another survey responded MOC was not voluntary.

¶ 248 -- Dr. Siva understood when he graduated from medical school that certification was required for a successful medical career and not voluntary.

¶¶ 261-263, 321-322 -- MOC not voluntary given Dr. Siva's and other radiologists' substantial sunk costs in certifications and MOC.

Plaintiff's tying claims do not hinge on whether ABR forces radiologists to purchase the *tying* product (certifications), but on its forcing radiologists to buy the *tied* product (MOC) by revoking certifications, an economic necessity. (*See* ABR at 3 n. 4). Thus, Plaintiff complains of ABR's leveraging of its monopoly power in certifications to force radiologists to buy MOC rather than other CPD products. The "probable" exploitation of leverage when a seller possesses market power warrants application of a *per se* tying analysis. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 512-13 (3d Cir. 1998). It is irrelevant whether ABR "controls" decisions of hospitals or insurers. (ABR at 9). What is relevant is that ABR takes advantage of the decisions of these and other industry participants to leverage its monopoly power and force radiologists to purchase MOC by tying certifications to MOC.[6]

### C. ABR's Single Product Argument Raises Fact Disputes, Improperly Asserts Affirmative Defenses On A Rule 12(b)(6) Motion, And Is Legally Meritless.

#### 1. ABR asserts "facts" outside the FAC and misrepresents FAC allegations, creating factual disputes that cannot be resolved on a motion to dismiss.

Much of ABR's motion rests on unsupported "facts" that (1) are outside the FAC and directly contradicted by its well-pled fact allegations, or (2) misrepresent FAC allegations. A listing of ABR's unsupported "facts" is attached as Exhibit 2 hereto. These "facts" should not be considered, but even if they are, at best they raise "issues of fact" that are "inappropriate for resolution on a motion to dismiss." *Cushing v. City of Chicago*, 3 F.3d 1156, 1163 (7th Cir. 1993).

---

[6]    ABR cites *Pirelli Armstrong Tire Corp. Ret. Tr. v. Walgreen Co.*, 631 F.3d 436 (7th Cir. 2011), in support of its "control" argument. (ABR at  9). *Pirelli*, however, was a Consumer Fraud Act case, not an antitrust case, and does not support ABR. The claim failed there not because Walgreen did not "control" the decisions of others, but because the alleged fraud was not adequately pleaded. Had the fraud allegations been sufficient, the claim would have survived regardless of Walgreen's control. *Id.* at 446.

**Contract "facts."** ABR argues repeatedly that Dr. Siva "knew" from "the outset" based on a "contract" that MOC was tied to certifications. (ABR at 3-4, 10, 11). In doing so, ABR misrepresents information and documents about MOC that Dr. Siva received "*after* he purchased his certification." (¶ 255; emphasis added).[7] Dr. Siva alleges that neither his application for certification nor the certificate itself referred to "initial" certification or to MOC. (¶¶ 250, 252-253). The FAC also alleges no contract obligating radiologists to buy MOC; nor does any such contract exist. Radiologists are forced to buy MOC because if they do not, ABR revokes their certifications, without which a successful medical career is impossible.

At any rate, ABR's argument is a diversion. Awareness that a tie exists when the tying product is bought does not make the tie any less coercive. Radiologists' knowledge of ABR's monopoly power and leverage cannot absolve ABR of its illegal tie. *See Viamedia*, 951 F.3d at 446-449 (consumers signed with Comcast for ad rep services with knowledge of tie).

**MOC benefits "facts."** ABR defends MOC by claiming it results in "continuous quality improvement, professional development, and quality patient care." (ABR at 3). But the FAC alleges in great detail the precise opposite: no legitimate business or procompetitive justifications exist for tying certifications and MOC; the tie provides no efficiencies and does not improve either product; MOC does not benefit physicians, patients, or the public; and independent studies have found no improvements in patient care as a result of MOC. *See* p. 5, *supra*. ABR argues that Plaintiff "concedes" MOC "ensures" radiologists are worthy to retain certifications. (ABR at 8).

---

[7] ABR attaches several documents to its motion, most of which are application or registration forms that are dated and were received by Dr. Siva years after he applied for his certification in 2000. Even if the documents were somehow construed to be a contract, which Dr. Siva does not concede, they are not in any way "central" to his claims, and therefore the Court should not consider them on this motion. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

But the so-called concession misrepresents the FAC allegation upon which ABR relies, which alleges only that ABR revokes the certifications of radiologists who do not purchase MOC. (¶ 9).

**Demand "facts."** ABR argues that by alleging radiologists would prefer not to buy MOC, Plaintiff admits there is not separate demand. (ABR at 8, 11). But ABR again misrepresents the allegation upon which it relies, which alleges only that MOC cannot be successful on its own merits without the tie. (¶ 144). In fact, Plaintiff specifically alleges elsewhere that rather than being forced to buy MOC, radiologists would prefer to buy CPD products for lifelong learning from others. (¶¶ 201, 264, 286-287, 330). ABR turns a blind eye to FAC allegations that MOC is a CPD product designed to promote lifelong learning, MOC is no different from other CPD products serving the same purpose, other vendors sold CPD products for decades separate from certifications, and radiologists bought CPD products for lifelong learning from others before ABR began forcing them to buy MOC. *See* pp. 2-3, *supra*.[8]

**Endorsement "facts."** ABR wrongly claims that Dr. Siva seeks to require ABR to accept other CPD products and to allow other entities to provide certifications "in ABR's name." (ABR at 9). But the FAC makes clear that in addition to money damages, Plaintiff asks only that ABR be enjoined from revoking certifications of radiologists who do not buy MOC. (¶¶ 12, 376).

---

[8]    ABR cites *Djebo Sales LLC v. Houghton Mifflin Harcourt Publ'g Co.*, No. 14-4657, 2015 WL 1969380 (D. N.J. Apr. 29, 2015), and states plaintiff there "could not plead" separate products, ABR's words, not the court's. (ABR at 11). But the court later *upheld* an amended tying claim, relying on additional allegations supporting separate demand. *Djebo Sales*, No. 14-4657, ECH Dkt. No. 73, at 2-3 (D.N.J. Jan. 28, 2016) (Exhibit 3 hereto). *Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530, 544 (E.D. Pa. 2019), likewise turned on whether separate "character of demand" had been pleaded (ABR at 10), but here the FAC includes new allegations in addition to those in *Kenney* demonstrating separate demand. *See* p. 7, *supra* and Exhibit 1 at 3-4. *Collins v. Assoc. Pathologists, LLC*, 844 F.2d 473 (7th Cir. 1988), also relied upon by ABR, was decided on summary judgment. (*See* ABR at 7).

Dr. Siva does not contend ABR should be prevented from determining its own standards or criteria for certifications or MOC. (¶ 12).[9]

**Franchise "facts."** ABR's analogy to franchises and heavy reliance on inapposite franchise cases betrays its misunderstanding of how franchises work. First, ABR is a monopolist with market power in certifications that forces radiologists to buy MOC by revoking their certifications. Franchisors, however, are not monopolists as a franchisee may choose from hundreds of franchise opportunities. Second, certifications and MOC are an economic necessity. Bundling products in a franchise, on the other hand, is purely voluntary, "consistent with the existence of a competitive market in which franchises are valued, in part, according to the terms of the proposed franchise agreement and the availability of alternative franchise opportunities." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441, 443 (3d Cir. 1997) (valid tying claim would exist if Domino's had market power in the tying product, as ABR does here).

And third, radiologists do not purchase licensing rights from ABR, share investment risk with ABR, or buy a uniform method of doing business from ABR. Thus, the economic rationale that certain efficiencies justify a franchisor's bundling does not apply here. *See* Areeda & Hovenkamp, ¶ 1710c3, at 117 (in franchise cases, "the tie is being used not to extract monopoly prices or drive out competitors, but rather as a mechanism by which the franchisor and franchisee share the risk of investment and operations").

---

[9] The Court in its prior opinion cited to the discussion of foreclosure of competition in *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835-36 (7th Cir. 1978). (Op. at 12-13). The Seventh Circuit did not address separate products, which had been submitted to the jury. It did, however, reject Sealy's brand-protection business justification defense, finding the jury could reasonably conclude that the scheme created a "captive market" forcing its licensees to purchase tied parts at "a premium price." 585 F.2d at 835. Creation of a "captive market" that did not exist before ABR's tie is exactly what the FAC alleges. *Ohio-Sealy* supports Plaintiff's claims of an illegal tie and does not exonerate ABR, as it now contends. (ABR at 9).

## 2. ABR's business justification arguments constitute affirmative defenses not appropriate for consideration on a Rule 12(b)(6) motion.

A principal emphasis of ABR's motion is the injection of fact-dependent business justifications for its tying scheme, centered on assertions that MOC is a "component" that complements certifications and is intended to ensure physician quality and improve patient care. (ABR at 2, 3, 8). *Jefferson Parish*, however, has "reject[ed] the view … that the legality of an arrangement of this kind turns on whether it was adopted for the purpose of improving patient care." *See also* Areeda & Hovenkamp, ¶ 1741b, at 174 ("The separate-products requirement is not an invitation to examine the general reasonableness of the bundle.").

Moreover, ABR's business justifications are affirmative defenses not properly considered on a motion to dismiss. *Jefferson Parish*, 466 U.S. at 25 n. 42 ("goodwill" justification for tie and similar arguments are "defenses"); *Viamedia*, 951 F.3d at 460 ("business justifications" are a "defense"); *Mozart Co. v. Mercedes-Benz of N.A., Inc.*, 833 F.2d 1342, 1349 (9th Cir. 1987) (argument that "tying arrangement is necessary to assure quality control and to protect its goodwill" an "affirmative defense") (internal quotation omitted). *See also* Areeda & Hovenkamp, ¶ 1741, at 175 ("Justifications can be considered as a defense to a tying claim, and normally are now so considered by courts."). Because a plaintiff is not required to anticipate and plead around affirmative defenses, the Court should not consider ABR's business justification arguments. *McDonald v. Adamson*, 840 F.3d 343, 347 (7th Cir. 2016).

## 3. Even if considered, ABR's assertion that MOC is either a "component of," "modifies," "improves," or "complements" certifications raises fact issues.

Even if ABR's "component" affirmative defense were considered, because it raises fact issues it cannot support dismissal. In *Multistate Legal Studies*, summary judgment in favor of defendants on a tying claim was reversed because a fact question existed whether a new workshop

(the tied product) added by defendants to their bar review course (the tying product) was a separate product. Like here, defendants argued the workshop was "nothing more than the improvement of a single product." 63 F.3d at 1547. The district court agreed with defendants, finding that adding an improvement "could not possibly" constitute tying of a second product to the first product. *Id*. The Tenth Circuit, however, found "a material factual dispute" over whether there was sufficient demand for the course without the workshop "to make it efficient to sell the two separately." *Id*. at 1548.

The FAC contains the same fact allegations relied upon by the Tenth Circuit in *Multistate Legal Studies* that supported separate products. These include: (1) ABR does not require "grandfathers" to buy MOC, just as some purchasers of the bar review course were not required to buy the workshop; (2) the two products have historically been sold separately; (3) separate fees; (4) "grandfathers" choose not to buy MOC, just as some purchasers of the bar review course chose not to buy the workshop; and (5) other industry participants view the products as separate. *Id*. at 1547-48. At best, ABR raises fact questions that cannot be resolved at this early stage. *Viamedia*, 951 F.3d at 460 ("balancing anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings").

Moreover, ABR's argument is a paradigm functional analysis, rejected by *Jefferson Parish*. 466 U.S. at 19 n. 30 (whether products "are functionally linked … is not in itself sufficient" to determine if they are separate). In *Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680 (4th Cir. 1992), plaintiff alleged Data General tied a diagnostic product to computer maintenance services. The district court concluded the diagnostic product was "merely one feature" of the unified "computer servicing" product, which it decided was the product consumers truly desired. It also found that the "only … legitimate purpose" for the tied product was to

"maintain and repair computer systems," and that since the two products "are inextricably bound together," they cannot be considered separate. *Id.* at 684. The Fourth Circuit reversed, calling "[t]his inquiry into purpose and use" by the district court "indistinguishable from the inquiry into the 'functional relationship' between products that was rejected in *Jefferson Parish*." *Id. See also Multistate Legal Studies,* 63 F.3d at 1551-52 (rejecting argument that incorporating "product improvement" creates a single product because demand rather than related function is proper analysis).

Finally, even products that are functionally linked can be separate products. *Jefferson Parish*, 466 U.S. at 19 n. 30 ("[w]e have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices") (collecting cases); *Viamedia,* 951 F.3d at 469 ("[t]he fact that buyers may wish to purchase and use two complementary products together does not, in and of itself, convert the two separate products into a single product"). *See also* Areeda & Hovenkamp, ¶ 1751a2, at 280, 281 (asking whether buyer "needs both items to produce the system result the buyer really values" is misguided and "departs greatly from precedent … [t]he more accurate question is not whether the buyer 'needs both' products, but rather whether it 'needs both' from the same seller").[10]

## II.    ABR's Anticompetitive Conduct Causes Antitrust Injury.

Antitrust injury includes injuries "of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Viamedia*, 951 F.3d at 481. Antitrust injury exists when the

---

[10]    *Kentmaster Manu. Co. v. Jarvis Prods. Corp.*, 164 F.3d 1243 (9th Cir. 1998), involved predatory pricing and not tying, plaintiff's pricing allegations conceded a single product, and there were no allegations of separate demand or antitrust injury. Further, unlike here, it *was* possible there to determine life cycle costs for the replacement parts. *See* ¶ 197 (ABR's repeated changes to MOC make it impossible to calculate life cycle costs). *Kentmaster* does not add to the analysis in this case given the FAC's well-pled allegations of separate products founded on *Jefferson Parish* and its progeny. (*See* ABR at 10).

anticompetitive conduct affects "prices, quantity or quality of goods or services." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996). *See also Chicago Prof'l Sports Ltd. P'ship v. Nat. Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (antitrust injury "comes from acts that reduce output or raise prices to consumers"). Consumers affected by the tie typically can state antitrust injury. *Viamedia*, 951 F.3d at 482.

ABR's anticompetitive conduct causes antitrust injury, including: forcing radiologists to buy MOC at monopoly prices (¶¶ 234, 267-268, 329, 339); thwarting competition in CPD products (¶¶ 123-124, 164-166, 264, 329, 340, 341, 343); diminishing the quality of CPD products and inhibiting innovation (¶¶ 123-124, 210-228, 342); entrenching ABR's monopoly in certifications (¶ 344); raising the cost of practicing medicine for radiologists (¶¶ 167, 204-205, 268, 345); and restricting the supply of radiologists, thereby harming competition (¶¶ 207, 345). These allegations support all three indicia of antitrust injury: ABR's conduct affects price (*e.g.*, ABR charges monopoly prices for MOC); quantity (*e.g.*, ABR thwarts competition in CPD products), and quality (*e.g.*, no relationship between MOC and any beneficial impact on physicians, patients, or the public). *See also Eastman Kodak*, 504 U.S. at 478 ("higher service prices and market foreclosure— is facially anticompetitive and exactly the harm that antitrust laws aim to prevent").

ABR argues that because the FAC alleges radiologists prefer not to purchase MOC, there can be no antitrust injury. (ABR at 9). This grossly misrepresents the actual FAC allegations that radiologists prefer to obtain certifications and CPD products from different vendors, and but for their certifications being revoked, would purchase CPD products for lifelong learning from others. (¶¶ 201, 204, 286-287, 330). ABR's thesis is also directly contrary to *Jefferson Parish*: "[T]he essential characteristic of an invalid tying agreement is the seller's exploitation of its control over

the tying product to force the buyer into the purchase of a tied product that the buyer either did not

want at all, or may have preferred to purchase elsewhere on different terms." 466 U.S. at 12.[11]

### III.  **The Antitrust Claims Are Timely.**

ABR does not contend Plaintiff's antitrust claims are fully time-barred, but only that they

are "partially" time-barred to the extent they seek to recover for injuries incurred before 2015.

(ABR at 13-14). First, it is well-settled that a motion to dismiss is not the proper mechanism to

assert a limitations defense. *Richards*, 696 F.3d at 637-38 (limitations normally a question of fact

raised as an affirmative defense and not appropriate for a Rule 12(b)(6) motion). S*ee also Jovic v.

L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 765 (N.D. Ill. 2014) (because "a complaint need not anticipate

nor overcome" limitations defenses, they are "typically unsuitable for consideration at the motion

to dismiss stage").

Second, even if a limitations defense were considered at this early stage, ABR's ongoing

illegal tying constitutes a continuing violation of the antitrust laws. When a continuing violation

exists, "the limitations period begins to run *not* when an action on the violation could first be

brought, but when the course of illegal conduct is complete." *United States v. Spectrum Brands*,

924 F.3d 337, 350 (7th Cir. 2019) (emphasis in original). *See also Brunswick Corp. v. Riegel

Textile Corp.*, 752 F. 2d 261, 271 (7th Cir. 1984) (Sherman Act) ("if a continuing violation extends

into the statutory period, the victim is entitled to complain about the whole violation, no matter

---

[11]  ABR takes language out of context from *Reifert*, a summary judgment case that did not address antitrust injury, but instead turned on whether the tie affected "a not insubstantial amount of interstate commerce." 450 F.3d at 319-20. (ABR at 13). *Young v. Lehigh Corp.*, No. 80 C 4376, 1989 U.S. Dist. LEXIS 11575, *48 (N.D. Ill. Sept. 26, 1989), also relied on by ABR, was decided on summary judgment as well, and wrongly applied an analysis of market power in *Jefferson Parish* to antitrust injury. *Western Power Sports, Inc. v. Polaris Indus. Partners L.P.*, No. 90-35359, 1991 U.S. App. LEXIS 29993, *5 (9th Cir. Dec. 11, 1991) (interpreting *Jefferson Parish* market power passage in the context of antitrust injury "would appear to be at odds with" its discussion of how tying arrangements restrain competition); *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 814-15 (1st Cir. 1988) (same).

how long ago it began."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp.3d 772, 807 (N.D. Ill. 2017) (applying continuing violation doctrine to claims filed by plaintiffs in 2016 for price-fixing scheme that began in 2008).

## IV. Plaintiff States a Claim For Unjust Enrichment.

Dr. Siva and other radiologists confer a benefit on ABR (MOC fees) that ABR wrongfully obtains by forcing them to buy MOC, and it is unjust for ABR to keep the benefit resulting from its unlawful conduct. (¶¶ 368-371). Nothing more is required to state a claim for unjust enrichment. *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 U.S. Dist. LEXIS 21518, *50- 51 (N.D. Ill. Feb. 24, 2015).[12]

ABR contends Dr. Siva purchased his certification and MOC "pursuant to contracts," thus barring an unjust enrichment claim. (ABR at 14).[13] Plaintiff, however, does not allege existence of a contract, much less assert a breach of a contract claim. Nor do the documents attached to ABR's motion establish that contracts exist. Instead, they are certification and MOC application forms and other MOC-related documents that neither constitute contracts nor contractually bind Dr. Siva in any way. ABR's argument also skirts the many fact issues that must be resolved, including mutuality and consideration, before contracts can exist. *See Gen. Cas. Co. of Wis. v. Techloss Consulting & Restoration*, No. 1:18-cv-6062, 2020 U.S. Dist. LEXIS 85703, *11 (N.D. Ill. May 15, 2020) ("existence or non-existence of an agreement is a question of fact."). If ABR wishes to plead the existence of contracts, it should do so as an affirmative defense.

---

[12]     In both *First Comm. Traders, Inc. v. Heinold Comms., Inc.*, 766 F.2d 1007 (7th Cir. 1985), and *Pace Am., Inc. v. Elixir Indus.*, No. 06 C 4661, 2009 U.S. Dist. LEXIS 6281 (N.D. Ill. Jan. 27, 2009), relied upon by ABR, plaintiffs pled separate contract claims in addition to unjust enrichment. (ABR at 14-15).

[13]     ABR's use of the plural "contracts" further shows that certifications and MOC are separate products.

Even assuming *arguendo* that contracts exist, it would not preclude an unjust enrichment claim because ABR's illegal tie falls outside the subject matter of the supposed contracts. *Chatham v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co.)*, No. 05 C 4742, No. 05 C 2623, 2006 U.S. Dist. LEXIS 92169, *11-14 (N.D. Ill. Dec. 18, 2006) (where unjust enrichment based on "a benefit procured through wrongful conduct" of misrepresentation, court rejected as "neither here nor there" the argument that a contract precluded claim). Finally, ABR's assertion that an underlying duty is required for an unjust enrichment claim is not an accurate statement of Illinois law. (ABR at 15). The case upon which ABR relies, *Phila. Indem. Ins. Co. v. Pace Sub. Bus Serv.*, 2016 IL App (1st) 151659, rests on two earlier cases that have been strongly criticized. *See Nat'l Union Fire Ins. Co. v. DiMucci*, 2015 IL App (1st) 122725, ¶ 66 (criticizing cases cited in *Phila. Indem.*, and calling duty requirement "not an accurate statement of the law on the equitable claim for unjust enrichment"). Thus, the most recent decision in this district addressing whether a "duty" is required for unjust enrichment, found no such requirement exists. *Zak v. Bose Corp.*, No. 17-cv-02928, 2019 U.S. Dist. LEXIS 54871, *23-24 (N.D. Ill. Mar. 31, 2019).

## CONCLUSION

For the reasons stated above, Defendant American Board of Radiology's Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. #56) should be denied.

Respectfully submitted,

**Plaintiff Sadhish K. Siva, individually and on behalf of all others similarly situated**

June 26, 2020                    By:  __/s/ C. Philip Curley_____
                                       One of His Attorneys

C. Philip Curley
Cynthia H. Hyndman
Robert L. Margolis
Benjamin E. Schwab
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 663-3100
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
rmargolis@robinsoncurley.com
bschwab@robinsoncurley.com

Katrina Carroll
CARLSON LYNCH LLP
111 West Washington, Suite 1240
Chicago, IL 60602
(312) 750-1265
kcarroll@carlsonlynch.com

Michael J. Freed
Brian M. Hogan
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn IL 60015
(224) 632-4500
mfreed@fklmlaw.com
bhogan@fklmlaw.com

Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
jjagher@fklmlaw.com