IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SADHISH K. SIVA, | ) |
| | ) |
| Plaintiff, | )  Case No. 19 C 1407 |
| | ) |
| v. | ) |
| | )  Judge Jorge L. Alonso |
| AMERICAN BOARD OF | ) |
| RADIOLOGY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION & ORDER**

Plaintiff, Sadhish K. Siva, brings this antitrust action against defendant, the American Board of Radiology ("ABR"), contending that the maintenance of certification ("MOC") requirements that ABR imposes on certified radiologists violate the Sherman Antitrust Act, 15 U.S.C. § 1. The Court granted ABR's motion to dismiss plaintiff's original complaint for failure to state a claim. (*See* Nov. 19, 2019 Mem. Op. & Order, ECF No. 48.) Plaintiff has filed an amended complaint, and defendant again moves to dismiss. For the following reasons, the motion is granted.

**BACKGROUND**

The Court summarizes plaintiff's allegations below, but it also assumes familiarity with its earlier opinion in this case, *see Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 269 (N.D. Ill. 2019). Plaintiff has expanded his allegations, but the core of his complaint is the same.

ABR is one of twenty-four member boards making up the American Board of Medical Specialties ("ABMS"). The ABMS member boards certify physicians in thirty-nine specialties and

eighty-six subspecialties. Plaintiff is a physician who is licensed to practice medicine and has been certified by ABR in diagnostic radiology since 2003.

Licensure is different from certification. Physicians are licensed by medical boards of the individual states, generally after they receive a medical degree and pass a three-step licensing examination. Most states require physicians to complete continuing medical education ("CME") courses periodically in order to maintain their license. Licensure is legally mandatory for any practicing physician.

Physicians are certified, in contrast, not by a state licensing authority but by nonprofit specialty boards such as ABR. More than a hundred years ago, at a time when medical education was not yet regulated or standardized, physicians began to form specialty boards to "define and differentiate between the subject matters of medical specialties, ensure adequate postgraduate medical education and training in their areas of specialty, and then test those candidates who wished to practice in the relevant specialized area of medical practice." (1st Am. Compl. ¶ 27, ECF No. 55.) ABR formed and began selling certifications in radiology specialties and subspecialties in 1934. Unlike licensure, board certification is technically voluntary, but, as a practical matter, according to plaintiff, it is all but mandatory. This is because hospitals, medical employers, insurers, and third-party payors require physicians to be certified before they will affiliate with, employ, insure, or reimburse physicians for providing medical services.

To obtain certification, a radiologist must pay for the opportunity to take and pass a uniform ABR-administered examination. For most of ABR's history, the certification ABR awarded following this examination was lifelong. This was the case when plaintiff began his residency in radiology in 1999.

In the second year of plaintiff's residency, ABR announced that it would eliminate lifetime certificates and issue its examinees only time-limited ten-year certificates, which it now calls "initial certification." In 2002, in conjunction with the new ten-year certificates, ABR imposed a "maintenance of certification" ("MOC") program, which requires ABR-certified radiologists to maintain their certification by completing continuing professional development ("CPD") activities. The MOC program has taken various forms, but in its current form, it consists of CME and "self-assessment" CME ("SA-CME") credits, ABR-administered testing known as "Online Longitudinal Assessment," and practice improvement projects. Plaintiff alleges that MOC has generated millions of dollars in revenue for ABR over the years, but in none of its various incarnations has it been demonstrably useful or effective in evaluating, training, or educating physicians, nor does it effectively serve its stated purpose of "reinforc[ing] the process of lifelong learning," particularly to the extent that MOC overlaps with—and is redundant of—state CME requirements. (*Id.* ¶ 169; *see id.* at ¶ 164.) Under a grandfather rule, radiologists who initially became certified prior to the imposition of the MOC program are not required to participate in MOC. For all other radiologists, MOC is mandatory, or ABR will revoke their certification.

In Count I of his amended complaint, plaintiff claims that ABR has tied its initial certification product to its newer maintenance of certification product and that the tying arrangement is *per se* illegal under section 1 of the Sherman Antitrust Act. According to plaintiff, ABR forces radiologists to purchase MOC to their detriment and the detriment of competing CPD providers such as the National Board of Physicians and Surgeons ("NBPAS"). In Count II, plaintiff asserts the same claim under the rule of reason, alleging that tying MOC to initial certification causes anticompetitive harm without providing procompetitive benefits.[1] Finally, in

---

[1] Plaintiff has not reasserted the monopolization claim under section 2 of the Sherman Act that he asserted in Count II of his original complaint.

3

Count III, plaintiff asserts a state-law claim of unjust enrichment, alleging that ABR has wrongfully retained the benefit of funds paid for MOC services that served no useful purpose to the physicians who purchased them. Plaintiff seeks damages and to enjoin ABR from revoking the certification of radiologists who do not complete MOC requirements.

## LEGAL STANDARDS

"A motion under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare

4

recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Plaintiff seeks relief via the Clayton Act, 15 U.S.C. §§ 15, 26, which provides a private right of action for treble damages to any person "injured in his business or property by reason of anything forbidden in the antitrust laws[.]" 15 U.S.C. § 15. Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . " 15 U.S.C. § 1. This language has long been interpreted to "outlaw only *unreasonable* restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992) (quoting *N. Pac. R. Co. v. United States,* 356 U.S. 1, 5-6 (1958)). An alleged tying arrangement is *per se* unlawful under the Sherman Act if "(1) a tie exists between two separate products; (2) the tying seller [ABR] has sufficient economic power in the tying product market to restrain free competition in the tied product market [the MOC or CPD market]; (3) the tie affects a not-insubstantial amount of interstate commerce in the tied product [MOC or CPD services]; and (4) the tying seller [ABR] has some economic interest in the sales of the tied product [MOC or CPD services]." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316-17 (7th Cir. 2006). The Seventh Circuit has suggested that "a plaintiff's failure to state a *per se* illegal antitrust claim does not necessarily prove fatal to his case if he can state a claim under the rule of reason." *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 210 (7th Cir. 1985) (citing *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 499-500 (1969)); *see DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1337 (Fed. Cir. 2014)

(applying Seventh Circuit law and citing *Reifert* and *Carl Sandburg*). However, under either the *per se* rule or the rule of reason, the plaintiff must establish that a tie exists between two separate products. *See* Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1742 (4th and 5th Editions) (hereafter, "Areeda & Hovenkamp") (suggesting that the same standard for the separate-products determination should generally apply under the *per se* rule and the rule of reason); *see also L.A.P.D., Inc. v. Gen. Elec. Corp.*, No. 94 C 664, 1994 WL 424120, at *3-4 (N.D. Ill. Aug. 11, 1994) (including separate products element in both *per se* and rule of reason analysis) (citing *Kodak*, 504 U.S. at 462 (applying *per se* rule), and *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 39 (1984) (O'Connor, J., concurring) (discussing rule of reason alternative), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)), *aff'd on non-antitrust grounds*, 132 F.3d 402 (7th Cir. 1997).

"Almost every product can be viewed as a package of component products[,] . . . even if the components are physically integrated at the point of sale to the consumer." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 703 (7th Cir. 1984). Whether two components are separate products "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19. Two items will be considered separate products only when there is "sufficient consumer demand so that it is efficient for a firm" to provide them separately. *Kodak*, 504 U.S. at 462. "Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the history of the products being, or not being, sold separately, or the sale of the products separately in similar markets." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) (citing *Kodak*, 504 U.S. at 462, and *United States v. Microsoft Corp.*, 253 F.3d 34, 87-88 (D.C. Cir. 2001)).

6

## ANALYSIS

This Court dismissed plaintiff's original complaint for failure to state a claim. In support of its present motion to dismiss, ABR argues that plaintiff again fails to state a tying claim because he does not plausibly allege that initial certification and MOC are two separate products, among other deficiencies.

In response, plaintiff relies on some of the same indicia of separateness that he cited in the last round of briefing, which include factors such as ABR's history of selling initial certification without MOC; charging separately for each item, *see Jefferson Parish*, 466 U.S. at 22 (anesthesia services billed separately from hospital services, supporting conclusion that they are separate products); a would-be competitor, NBPAS, selling MOC without selling initial certification; and the grandfather rule under which ABR does not require physicians certified before 2002 to purchase MOC. He also responds by pointing to certain new allegations suggesting that initial certification and MOC have different purposes and are therefore separate products. Specifically, plaintiff asserts that MOC is a kind of CPD product and that CPD products, which have existed since long before MOC came into existence, focus on encouraging lifelong learning, not assessing or evaluating a radiologist's competency. Certification, on the other hand, has been considered nothing more than an early-career event, designed to ensure that radiologists were adequately trained; that is, it was always meant to be only a "one-time, snapshot assessment" of a radiologist's education and training following medical school and residency.

Much of the Court's reasoning in its previous opinion still applies to the amended complaint. Most critically, notwithstanding certain vague allegations that another ABMS member board (not ABR) sold an unsuccessful CPD product for a period of time in the 1970s and 1980s, plaintiff has still not alleged that ABR ever actually sold initial certification and MOC separately. Rather, as before, the substance of plaintiff's allegations is that ABR used to sell one-time, lifelong

7

certification without any MOC component, and now it has altered its certification product to consist of two components: (1) initial, time-limited certification, and (2) MOC.[2] The Court previously rejected the argument that these allegations amount to a history of separate sales from which an inference of separate demand could be drawn, *Siva*, 418 F. Supp. 3d at 272, and it sees the issue no differently now. To allege that radiologists began to buy MOC alongside initial certification after ABR imposed the MOC requirement, but they bought certification without MOC while ABR imposed no MOC requirement, suggests not that there is somehow separate demand for certification and MOC but, to the contrary, that "'the character of the demand for the initial certification and the MOC is the same: certification from'" ABR. *Id.* at 273 (quoting *Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530, 545 (E.D. Pa. 2019)); *see Lazarou v. Am. Bd. of Psychiatry & Neurology*, No. 19-CV-01614, 2020 WL 5518476, at *7 (N.D. Ill. Sept. 11, 2020) (explaining that another ABMS member board with a similar sales history "never sold initial certifications and MOC separately" while its certifications remained lifelong because "neither initial certifications (in the sense of time-limited certifications) nor MOC existed" then).

As this Court previously explained, "under *Jefferson Parish*, a product's aggregation of separate components into a whole is only a tie-in 'if there are separate markets for each product." *Siva*, 418 F. Supp. 3d at 273 (quoting *Jack Walters*, 737 F.2d at 703). But the demand for maintenance of certification is "'generated wholly'" by the demand for certification generally,

---

[2] Plaintiff insists in his briefs that he has not alleged that MOC is a "component" of certification; rather, plaintiff argues, he has specifically alleged that MOC is a separate product, and any suggestion that it is a component is a denial of his allegations, which is inappropriate at the pleading stage. The Court disagrees. Whether MOC is a component of certification or a separate product from certification is a legal conclusion, and the Court is not required to assume that the legal conclusions a plaintiff articulates in a complaint are correct. *See Alam*, 709 F.3d at 665-66 (citing *Brooks*, 578 F.3d at 581). The Court's task is to determine, setting aside legal conclusions, whether plaintiff has pleaded sufficient factual matter, assumed true, to permit a court to draw a plausible inference that MOC and initial certification are separate products. As the Court explains in this Opinion, given the substance of plaintiff's own factual allegations of the nature of ABR's certification product, no such inference is plausible.

given that MOC "'may be purchased only by'" ABR-certified radiologists who "'use it solely as an integral part of'" the ABR-certification "'method.'" *Siva*, 418 F. Supp. 3d at 275 (quoting *Casey v. Diet Ctr., Inc.*, 590 F. Supp. 1561, 1564 (N.D. Cal. 1984)). Thus, "'[t]he competitive purposes of the rule against tying are not served by fractionating' ABR's method into 'separate components'" of initial certification and MOC, "as there is no 'market distinct from that of [certification] itself' for those unbundled components." *Siva*, 418 F. Supp. 3d at 274 (quoting *Casey*, 590 F. Supp. at 1566); *see also Subsolutions, Inc. v. Doctor's Assocs., Inc.*, 436 F. Supp. 2d 348, 354 (D. Conn. 2006) (relying on *Casey* to conclude that the Subway restaurant franchise and Subway's required point-of-sale system are not separate products). Characterizing MOC as a CPD product does not change any of this reasoning.

This Court previously relied heavily on *Kenney v. American Board of Internal Medicine*, 412 F. Supp. 3d at 544-47, a virtually identical case to this one. Despite plaintiff's expanded allegations, *Kenney* is no less persuasive now. Further, since then, another court in this district has issued a similar decision in yet another virtually identical case, *Lazarou v. American Board of Psychiatry & Neurology*, 2020 WL 5518476, at *8-11. *Lazarou* is equally persuasive.

Plaintiff argues that the fact that ABR bills separately for MOC and initial certification demonstrates that they are separate products. The Court did not address this issue head-on in its prior opinion, but the courts in *Kenney*, 412 F. Supp. 3d at 547, and *Lazarou*, 2020 WL 55184762020, at *8, did, and they specifically rejected the plaintiffs' argument. These courts found the plaintiffs' cases—*Jefferson Parish*, 466 U.S. at 22, and *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1575 (11th Cir. 1991)—to be distinguishable, as they involved stronger historical evidence of the allegedly tied products being sold separately. Plaintiff cites the same cases here, and this Court agrees with *Kenney* and *Lazarou* that they are inapposite. The same is

9

true of *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*, 63 F.3d 1540, 1547 (10th Cir. 1995), and *Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680, 684 (4th Cir. 1992), which are similarly distinguishable.[3]

While separate billing may, in some circumstances, indicate separate products, it need not always do so. For example, defendant cites *Klamath-Lake Pharmacy Association v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1290 (9th Cir. 1983), in which a defendant allegedly tied a pharmacy benefit plan and the plan's drug purchase restrictions. The plan's purchasers paid for the plan and then separately made copayments with each drug purchase. The court explained that this fact did not establish that the plan and the drug purchase restrictions were separate products any more than it would if a gardener offered to maintain a customer's garden but required the customer to supply the fertilizer. *Id.*[4] In either case, the seller is not tying products together but instead requiring the buyer to pay a portion of the costs of a single product—whether a pharmacy benefit plan or garden maintenance—as he goes. The separate billing for MOC is similar: ABR requires certified radiologists to pay for the maintenance portion of the certification product as they go, but in the totality of the circumstances, that does not suffice to make the maintenance component a separate product. Rather, "the circumstances taken as a whole point toward one product rather than two." *Lazarou*, 2020 WL 5518476, at *8.

---

[3] In a similar vein, plaintiff relies on the Seventh Circuit's recent decision in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 470 (7th Cir. 2020), but that section 2 monopolization case is distinguishable for a number of reasons, including that there was evidence that the defendant sold the products in question separately in certain markets. *See id.* (citing evidence of "other [regions] where [the defendant] sells Interconnect services separately."). Here, plaintiff has not made plausible allegations to the same effect.

[4] Plaintiff argues in sur-reply that Areeda and Hovenkamp criticized the reasoning of *Klamath*, *see* Areeda & Hovenkamp ¶ 1745g4, but plaintiff overreads this criticism, which was not directed at the court's approach to the issue of separate billing, specifically, but at the court's approach to the bundling of health insurance and medical goods more generally. That aspect of the decision is not relevant here.

10

The main difference between the original complaint and the amended complaint is that plaintiff alleges that MOC and initial certification are separate products because MOC is a kind of CPD product, and a separate market for CPD products has existed since long before ABR began to impose an MOC requirement. But alleging that MOC falls under the broad umbrella of CPD products does not separate it from ABR's core certification product because it does not account for the fact that MOC has been essentially integrated into the certification product in a way that no other CPD product has. *See Subsolutions*, 436 F. Supp. 2d at 354; *see also Casey*, 590 F. Supp. at 1564. Plaintiff ignores that the CPD program that makes up MOC is "provider-specific," *i.e.*, specific to ABR, in order to be useful to consumers in maintaining an ABR certification. *Kaufman*, 836 F.3d at 144-45 (cable television boxes are not a separate product from cable television services because, unlike cable modems, which "transmit all available content," cable television boxes must be "designed to receive the signal from a particular provider, which requires the provider's cooperation"); *see Kenney*, 412 F. Supp. 3d at 544-45 (relying on *Kaufman*), *Subsolutions*, 436 F. Supp. 2d at 354 (unlike "largely fungible supplies," point-of-sale system tailored to franchisor's business was not a separate product from the franchise). Just as a cable box that cannot interpret a particular cable provider's signals has no value to a purchaser of that cable provider's cable television services, a maintenance-of-certification program that lacks the imprimatur of the certifying entity has no value to any physician seeking to demonstrate that he has obtained and maintained certification. *See Kaufman*, 836 F.3d at 144-45; *see also Siva*, 418 F. Supp. 3d at 273-75; *cf. Torres v. Illinois Bell Tel. Co.*, No. 86 C 1718, 1987 WL 15389, at *2 (N.D. Ill. Aug. 3, 1987) (maintenance of switchboard equipment was not a separate product from lease of switchboard equipment but a condition of the agreement to use the leased equipment). Plaintiff has not plausibly alleged that that there is separate demand for MOC and initial certification, *i.e.*,

11

that a physician would want MOC separately from initial certification; to the contrary, it appears from his allegations that it is precisely the fact that the two components come from the same seller (ABR) that makes them desirable. Plaintiff may characterize MOC as a kind of CPD product, but the fact remains that plaintiff alleges that radiologists buy it to maintain ABR certification, and therefore it is not "fungible" with CPD products that do not serve that purpose. *Subsolutions*, 436 F. Supp. 2d at 354; *see Lazarou*, 2020 WL 5518476, at *8 (explaining that NBPAS's purportedly competing MOC product does not qualify as "the tied product" because it does not "'maintain' the same certification"). Thus, a "fundamental misconception about the nature of the entire certification product offered by [ABR] undercuts [plaintiff's] arguments" again. *See Kenney*, 412 F. Supp. 3d at 545.[5]

Plaintiff alleges that there is no evidence that MOC adds any value to the initial certification *i.e.*, it does not aid in signaling that a radiologist is well-trained and well-qualified, and he argues that because MOC does not effectively serve the purposes of initial certification, it must be a separate product. But this argument seems to derive from the function of the components rather

---

[5] Even if the Court indulges plaintiff by assuming that the MOC component should be considered a CPD product like any other that was "separately available on the market before the innovation" of bundling it with initial certification, that does not, by itself, make it a separate product now. "[J]ust about every new product" is made up of components that were previously available separately. Areeda & Hovenkamp ¶ 1746a. The separate availability of the components only suggests a tie if buyers were already "putting the items together to operate in the same manner as the defendant's bundle." *Id.* That is not this case because, by redesigning its certification product to include an initial examination component and subsequent MOC component, ABR bundled initial certification and MOC to "operate together in a previously unattempted fashion." *Id.* While it may be true that physicians have always purchased CPD products, plaintiff himself alleges that CPD products serve a different purpose from certification and had nothing to do with it until the maintenance of certification component was added, so consumers were not purchasing the components to operate together as they do now. This makes the new bundle not a tie but a single, new product composed of separate, previously available components. While the bundle is no longer new, having existed in some form since 2002, this rationale "would seem to last as long as the basic requirement can be met that the bundle works better when bundled by the defendant than by intermediaries or end users." *Id.* ¶ 1746d. As the Court has explained above, the certification bundle only works, to the extent it works at all, when bundled by ABR.

than the character of the demand for them, and it therefore does not comport with the *Jefferson Parish* test.[6]

It is true, as plaintiff argues, that many of the cases on which both parties rely throughout their briefs were decided, unlike this case, at the summary judgment stage or later, after the parties had the opportunity to develop evidence in discovery. *See, e.g., Multistate Legal Studies*, 63 F.3d at 1547. But despite the difference in procedural posture, these cases help to illustrate what a Sherman Act plaintiff must prove to prevail. Plaintiff's detailed allegations in a complaint of over seventy pages do not contain or adumbrate facts that, if developed and proven, would establish certain indicia of separateness, such as any genuine history of separate sales of the allegedly separate products. Without such evidence, the other indicia of separateness that plaintiff has cited do not suffice to establish the existence of separate products. Again, based on plaintiff's own allegations, "the circumstances taken as a whole point toward one product rather than two," *Lazarou*, 2020 WL 5518476, at *8, and plaintiff has not plausibly alleged facts that, assumed true, would permit a reasonable factfinder to determine otherwise.

On top of all of this, even if the Court assumes that initial certification and MOC are separate products, the Court still fails to see in what sense the tying arrangement alleged here poses a risk of foreclosure of competition in the tied market. "The traditional antitrust concern with [a tying arrangement] is that if the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well, and the

---

[6] Additionally, Areeda and Hovenkamp warn that antitrust scrutiny of new bundles by courts, which "lack the technical expertise to judge product design," would likely "result in errors that would deter socially desirable innovations and variations in product design," so courts in such circumstances "should find a single product." *Id.* ¶ 1746b; *see Info. Res., Inc. v. A.C. Nielsen Co.*, 615 F. Supp. 125, 129-30 (N.D. Ill. 1984) (finding a single product where the alleged tie was the result of a "new technique" added to the defendant's existing data-gathering product in an "attempt to improve" it and reasoning that the product "cannot be broken down into each miniscule type of analysis but rather must be looked at as an overall service").

result will be a second monopoly." *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008); *see also Kaufman*, 836 F.3d at 142, *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 795 (1st Cir. 1988) (Breyer, J.). The Court has already rejected the theory that NBPAS is a would-be competitor foreclosed from offering MOC because "no one *can* provide certification in ABR's name but ABR," *see Siva*, 418 F. Supp. 3d at 276. This Court continues to believe, as the court in *Lazarou* put it, that NBPAS's certification and MOC "do not 'maintain' the same certification and thus NBPAS does not actually offer the tied product," so there is no foreclosure. *Lazarou*, 2020 WL 5518476, at *8 (citing *Kenney*, 412 F. Supp. 3d at 546-47). Plaintiff has also alleged that no radiologists would purchase MOC at all if it were not tied to initial certification; but if so, that makes MOC a "phantom product" for purposes of the tying claim, which therefore "can . . . be dismissed on the ground that the case involves no relevant foreclosure: because the second product is unwanted and has no value, the forced purchase of it cannot foreclose other suppliers of the second product." Areeda & Hovenkamp ¶ 1750a & n.1; *see id.* ¶ 1724 (citing *Reifert*, 450 F.3d at 315-18); *Siva*, 418 F. Supp. 3d at 275, *Lazarou*, 2020 WL 5518476, at *9-10.

To the extent that plaintiff's theory is that MOC is a CPD product that has value as such, the Court still fails to see any relevant foreclosure because plaintiff has alleged that ABR incorporates CME products provided by other CPD providers into its MOC program. In fact, according to plaintiff, certain MOC requirements are redundant of CME requirements for state licensing and can be fulfilled by the same CPD products provided by third parties. If so, there is no danger that the tie alleged here will give ABR a "second monopoly" in CPD products; to the contrary, plaintiff suggests that radiologists can continue using some of the same CPD products they have always used for MOC credit.

There is little else to say that would not belabor the point or reiterate the reasoning of the Court's earlier opinion, most of which is equally applicable to the present motion to dismiss. The above suffices to demonstrate that plaintiff fails to state a tying claim under section 1 of the Sherman Act. As for the unjust enrichment claim, it arises under Illinois law, and, having concluded that plaintiff fails to state a federal claim, the Court declines to exercise supplemental jurisdiction over his state claim, just as it did in its prior decision in this case. *See Siva*, 418 F. Supp. 3d at 279.

For these reasons, plaintiff's amended complaint is dismissed. Although the Court doubts at this point that plaintiff will be able amend the complaint to state a claim, it cannot say so with certainty, so the dismissal is without prejudice and with leave to amend. Alternatively, plaintiff may elect to stand on the amended complaint and ask the Court to enter a final and appealable judgment. *See Otis v. City of Chicago*, 29 F.3d 1159, 1167 (7th Cir. 1994) (en banc); *see generally N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1271-72 (D.C. Cir. 2020) (Millett, J., dissenting) (citing *Otis* and other cases addressing circumstances under which dismissal with leave to amend becomes appealable).

## CONCLUSION

Defendant's motion to dismiss [56] is granted. Plaintiff's First Amended Complaint [55] is dismissed without prejudice. Plaintiff shall file any amended complaint by 2/5/21.

SO ORDERED.  ENTERED: January 8, 2021

_____
**HON. JORGE ALONSO**
**United States District Judge**